(A.R.D. 129)

E. DILLINGHAM, INC., ET AL. *v.* UNITED STATES

Entry No. 0–662, etc.

## Third Division, Appellate Term

(Decided March 30, 1961)

*Gilbert & Segall* (*Harold R. Tyler, Jr.,* and *Phil E. Gilbert, Jr.,* of counsel) for the appellants.

*William H. Orrick, Jr.,* Assistant Attorney General (*Daniel I. Auster,* trial attorney), for the appellee.

Before JOHNSON, DONLON, and RICHARDSON, Judges ; RICHARDSON, J., concurring

JOHNSON, Judge: This is an application for review of a decision and judgment of the trial court, holding that foreign value, as defined in section 402(c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, was the proper basis for the appraisement of the involved merchandise and that such value was the appraised value. *E. Dillingham, Inc., et al.* v. *United States,* 42 Cust. Ct. 472, Reap. Dec. 9306.

Said merchandise consists of so-called "Cobalt 60 Beam X-ray units," four being Model B Theratron units and three being Model C Theratron, Jr., units. These units were manufactured by Atomic Energy of Canada, Ltd. (AECL), a corporation wholly owned by the Canadian Government and located at Ottawa, Canada. They were purchased by General Electric Co. of Milwaukee, Wis. (GE) at the manufacturer's list prices, less 20 per centum, and were appraised on the basis of foreign value at said list prices, the price for Model B being $57,000 and that for Model C $22,500, Canadian currency. These units were imported in 1954, 1956, and 1957 in an unassembled or knocked-down condition, and were shipped directly from Canada to the premises of GE's customers, where they were assembled and installed by GE.

The record establishes that these "Cobalt 60 Beam X-ray units," when assembled, installed, and equipped with radio-active cobalt, are used by hospitals and clinics for therapeutic and diagnostic purposes in the treatment of cancer. The cobalt itself, which is affixed to the units after assembly and installation, is not included in the merchandise under consideration.

These X-ray units are offered for sale by AECL to hospitals, radiologists, and radiology clinics, in Canada, the United States, and other countries. They are also offered to or through certain agents or jobbers whom the company feels are capable of installing such units. In both cases, the merchandise is shipped to the place where it is to be installed in a knocked-down condition. When it is sold by AECL to hospitals and clinics, AECL does the work of assembly, installation, and survey. In other instances, this work is done by a jobber or agent, such as GE. All sales are in quantities of one, whether made to users or agents.

According to testimony, hereinafter referred to in more detail, these units are offered to users at advertised list prices, plus a fee for installation, so that the customer receives a completely assembled, installed, electrically hooked-up, warranted unit, and a radiation survey is taken of the treatment area. The units, unassembled, uninstalled, and unwarranted, are offered to selected jobbers or agents at list prices, less a discount.

In the instant case, appellants originally claimed that there was no foreign, export, or United States value for the merchandise and that the proper basis of valuation was cost of production, but, on appeal, have confined themselves to the contention that there was a foreign value but that it was the list prices, less a discount of 20 per centum, rather than the values found by the trial court.

The trial court held that the list prices included an amount for surveying, assembling, hookup, and warranty; that there was an installation charge in addition; that whether the merchandise was sold to users or GE, it was delivered in a knocked-down condition; that the merchandise was freely offered for sale for home consumption to all purchasers at the prices found by the appraiser; that the merchandise, in its imported condition, was identical to the merchandise sold in Canada for home consumption and for export; that the fact that here GE assumed the burden of surveying, assembly, hookup, and warranty did not make the imported merchandise dissimilar.

As we read the record, it does not support all of these findings.

Paul M. McNally, accountant for AECL, testified as follows as to sales to consumers:

Q. Now, if [sic] those cases and I am referring now to Plaintiff's Exhibit 3 which is the list as you described it, which shows sales by you direct to users, what did you sell those users?—A. We sold them a completely installed and operating unit.

Q. In other words, you gave it to them in an assembled, installed and operating condition?—A. That's right. [R. 31.]

\* \* \* \* \* \* \*

Q. \* \* \* What price do you charge and what do you give a purchaser such an ultimate consumer for that price and let's start first if we may with the Model B?—A. We charge the customer an advertised price, a list price, plus a fee for installation and he gets a unit which is completely assembled, installed, electrically hooked-up, all completed and there is a radiation survey taken of the treatment area.

Q. For that price does your company issue a warrant against unit workmanship?—A. They are warranted for one year.

\* \* \* \* \* \* \*

Q. Taking the period from October or immediately preceding October, 1954, up until this year, which is the period of shipment we are talking about in these cases, what was the prevailing price plus cost of installation that you charged

to your hospital or similar users?—A. $57,000. I can't be sure that there wasn't a price change in there.

\* \* \* \* \* \* \*

Q. Now, when you give us this figure, Mr. McNally, you don't include in that figure the charge you told us about for installation, do you?—A. No, that is an extra $2,500 for Model B.

Q. In other words for $57,000 or in round numbers $57,000 during this period, plus an additional charge of installation, you gave a hospital a fully assembled, fully installed, operating and warranted unit for that price?—A. That's right. [R. 34–36.]

\* \* \* \* \* \* \*

X Q. But your $57,000 list price does not include installation, does it?—A. No.

X Q. Your installation charge on that particular item is an additional $2,500?—A. That is right.

\* \* \* \* \* \* \*

X Q. Do those two prices, the $2,500 and the $500 include your radiation survey or is that an extra charge?—A. No, that is included. [R. 74–75.]

\* \* \* \* \* \* \*

X Q. And your contract read $57,000 to each of those users plus a $2,500 for installation charges on the B and it was $22,500 plus $500 for installation for the C?—A. Yes.

\* \* \* \* \* \* \*

By Judge Lawrence:

Q. But your factory price was $57,000 and $22,500?—A. Yes, that is hard to say. We never raised a sales contract that did not include the installation.

\* \* \* \* \* \* \*

Judge Lawrence: I want to ask you one more thing about this price. I understand that the $57,000 was for the B machine and that there was a $2,500 charge added to that for installation?

The Witness: Yes, sir.

Judge Lawrence: Why is it added if as you say the price, the installation is included in the sales price, if the sales price is $57,000, it doesn't include the $2,500, does it? That is additional?

The Witness: I would say that the only reason the price list has gone up that way is to make the price palatable.

\* \* \* \* \* \* \*

Judge Lawrence: What would be the price you remember for Model B on your price list?

The Witness: It would show a Model B $57,000 sold F.O.B. Ottawa. There would be an installation cost for $2,500.

\* \* \* \* \* \* \*

Judge Lawrence: In other words, you do have a basic price for the two models, each one has a basic price; then there is an indication somewhere in your price list there would be $2,500 for installing B and the different $500 for installing the junior one.

The Witness: That's right, your Honor. [R. 120–123.]

The record presented also shows the following:

Sales are made to selected jobbers or agents of units which are unassembled, uninstalled, and unwarranted for 80 per centum of the

list price, that is, 80 per centum of $57,000 for the Model B and 80 per centum of $22,500 for Model C. Sales at these prices are restricted to concerns with which AECL has working arrangements and which it determines are qualified to handle the assembling and installation of the units and to issue a warranty. Some of the agents receive a lesser discount where they agree to install the unit but not to service it, and others receive a still smaller discount where they simply sell the equipment but neither install nor service it. The 20 per centum discount is allowed only to three agents: GE in the United States, Society Lombarda in Italy, and United States Radium Corporation, Europe. Sales at this discount were formerly made also to Westinghouse in the United States.

Sales have never been made to anyone other than an ultimate user in Canada, but it was stated by the witness that if GE made a sale to a hospital in Canada, AECL would sell the unit to GE at the list price, less 20 per centum. No such sale had ever been consummated and no such offer had been made to anyone other than GE. AECL never sold a unit to a user hospital in an unassembled, uninstalled, unhooked-up, and unwarranted condition. The installation was always included in the sales contract.

The work of installation begins with the assembling of the parts. Cranes and rigging equipment are needed to assemble Model B. The legs are sunk into the floor and bolted. These operations require two of AECL's personnel and they always have to hire riggers. The radiation survey after the installation consists of measuring the radioactivity in various locations inside the room and in adjoining areas outside to see that there is no place that would be dangerous to the health of the people working in the area. The complete installation and radiation survey requires the services of an engineer and a technician for 10 days for Model B and for 4-man days for Model C.

Appellants contend that the prices of $57,000 for Model B and $22,500 for Model C include an amount for surveying, assembling, hookup, and warranty and that, in addition, there was an installation charge of $2,500 and $500, respectively. Appellee's position is that the list prices are for the units *per se* and that the additional charge is for survey, assembly, installation, hookup, and warranty. The record is not entirely clear on this point, but it indicates that the two amounts were usually paid in one sum; but the division into list prices and installation charges was for the purpose of making the total appear less alarming; and that the user was sold a completely installed and operating unit for which he paid the two amounts.

Appellants claim that the appraisement was erroneous on the ground that the appraiser used as a basis the list price which was charged

users for fully assembled, surveyed, hooked-up, and warranted machines, whereas the merchandise purchased by GE consisted of unassembled, uninstalled, unsurveyed, and unwarranted machines, and that the latter were not similar to the former.

It is evident that the parts of the units *per se* were identical whether sold by AECL to a user or to an agent such as GE. The difference is that, in the first case, the unit was sold at a list price, plus an installation fee, so that the user paid for and received an assembled, installed, hooked-up, surveyed, and warranted unit, whereas, in the second case, the agent paid for only the parts of the units *per se*. In both cases, of course, the merchandise was actually delivered in a knocked-down condition and was assembled and installed at the hospital or clinic.

In *United States* v. *Draeger Shipping Co., Inc.*, 29 C.C.P.A. (Customs) 258, C.A.D. 199, it was held that unassembled parts of calculating machines were not similar, within the meaning of section 402(e), Tariff Act of 1930, defining United States value, to machines imported in an assembled condition. Likewise, in the instant case, machines sold in a knocked-down condition are not similar to machines sold in an installed, assembled, hooked-up, and warranted condition. The fact that, in the *Draeger* case, the parts were assembled at importer's factory and sold as complete machines, whereas here the machines were delivered in a knocked-down condition and assembled at the consumer's establishment is not material in determining whether merchandise consisting solely of the parts of a unit is similar to completed, installed machines, even though they had been delivered in parts to the user's establishment and there assembled and installed by the seller. In the instant case, where assembly and installation were complicated matters requiring expert technical knowledge and ability, it cannot be said that unassembled parts of a unit are similar to a completely assembled, installed unit for valuation purposes. It is obvious that parts of such a unit are something different from such a unit assembled, installed, and ready for use, and that the latter is of more value than the former. *United States* v. *H. W. Robinson & Co.*, 25 C.C.P.A. (Customs) 395, 402, T.D. 49484. Note also *United States* v. *Morganite Brush Co.*, 18 C.C.P.A. (Customs) 90, T.D. 44063, where it was held that the imported merchandise, which was in an unfinished condition and was not sold in that condition in this country or the country of exportation, was not similar, for the purposes of appraisement, to the finished brush sold in this country. It was held error to appraise the merchandise on the basis of its value after it had been further processed, with an allowance for the cost of such processing.

The issue in the instant case is whether there is a price at which the imported merchandise, the equipment *per se* in a knocked-down condition, is freely offered to all purchasers in the ordinary course of trade for home consumption in Canada, and if so, what that price is. It is clear that the list price, less the 20 per centum discount, is not such a price, since the merchandise was not offered to all purchasers at that price but only to GE in the home market and for export to the United States, and to other selected agents in other countries. Thus, appellants' claim that the foreign value is the list prices, less 20 per centum, cannot be sustained.

The appraised value is the list prices without the addition of the installation charges. Even assuming that the list prices were for the units *per se* in a knocked-down condition and did not include any part of the cost of assembly, installation, and warranty, the record does not establish that the units were offered to all users in Canada (the only purchasers other than agents) at the list prices alone. While there are some statements in the record that the list prices were basic prices, Mr. McNally testified positively that the units were never offered to users in an uninstalled, unassembled, unwarranted condition; that the sales contract always included an installation charge; and that the price was divided into parts in order to make it more palatable. It seems clear, from this evidence, that the units *per se* were not freely offered for sale to all purchasers for home consumption in Canada. While the pricelists might be some evidence that the equipment *per se* was freely offered for sale at the prices quoted, that proposition has been completely negatived by the testimony that the merchandise was never offered or sold that way. What was freely offered to all purchasers were completely assembled, installed, hooked-up, and warranted machines, and said machines were offered at the list price, plus installation charges. Under these circumstances, no foreign value for unassembled, uninstalled, unhooked-up, unwarranted units can be found, since there was no price at which such merchandise was freely offered for sale to all purchasers.

In the instant case, appellants originally claimed that cost of production was the proper basis for the determination of the dutiable value of the merchandise and some evidence of cost of production was introduced at the trial. However, its weight and sufficiency were not considered by the trial court in view of its finding that foreign value existed. In their assignment of errors, appellants claim that the trial court erred in failing to conclude that the dutiable value was the cost of production, but, at the oral argument, counsel stated: "* * * though we urged below cost of construction, we say no, that it's con-

ceivable on this record, the evidence that came out at the trial, that foreign value could be found, but not the foreign value found in dollars and cents by the appraisers and Judge Lawrence."

Since the record before us will not support a finding of foreign value; since the case was presented to us solely on the theory that there was a foreign value; and since the evidence as to cost of production is meager and was not considered by the trial judge, the decision and judgment of the trial court are reversed, and the case is remanded to the trial court for further proceedings, including the introduction of additional evidence as to cost of production. Judgment will be rendered accordingly.

### CONCURRING OPINION

RICHARDSON, Judge: I concur with my colleagues that there was no foreign market value for the merchandise which appellants imported from Canada into the United States.

The decision of the single judge emphasizes what was physically delivered to the consumer hospitals in Canada by Atomic Energy of Canada, Ltd., and what was physically imported into the United States by General Electric Co. From this point of view, the merchandise was the same in both instances. However, the offers for sale and the sales for home consumption in Canada and the offers for sale and sales to the General Electric Co. in the United States did not embrace the same or similar merchandise. "Legally" the sales in Canada were not complete until the X-ray units were assembled, hooked-up, and installed. Where there is a contract to sell specific goods and the seller is bound to do something to the goods (as assemble, hookup, and install them), for the purpose of putting them in "a legally deliverable state," the sale is not complete and property does not pass until such things are done. *Hartley* v. *Lapidus & Holub Co.*, 216 F. 92 (8th circuit) ; *Ely & Walker Dry Goods Co.* v. *Adams Mfg. Co., Inc.*, 105 F. (2d) 906 (2d circuit) ; 3 Williston on sales (rev. ed.), section 619.

In this case, the merchandise sold to and imported by appellants was unassembled, unhooked-up and uninstalled—merchandise different from that sold to consumers in Canada.

Since 28 U.S.C.A., section 2631, imposes the duty on the court to determine the value of the merchandise and the court has concluded that foreign value is not the value to be used, on the facts in this case, the presumption as to the correctness of the finding of value by the appraiser in 28 U.S.C.A., section 2633, is not applicable.

I join in reversing the decision and judgment of the trial court and in remanding the case to the trial court for further proceedings, including the introduction of additional evidence as to cost of production.