(A.R.D. 151)

D. C. Andrews & Co., Inc., et al. v. United States

Entry No. 717233, etc.

## Third Division, Appellate Term

(Decided March 5, 1963)

*John D. Rode* (*Ellsworth F. Qualey* of counsel) for the appellants.
*John W. Douglas*, Acting Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the appellee.

Before Johnson, Donlon, and Richardson, Judges; Donlon, J., concurring

Richardson, Judge: This is an application to review the decision and judgment of a single judge, sitting in reappraisement, holding that foreign value is the proper basis of valuation of metal lathes and parts, imported by appellants from West Germany (47 Cust. Ct. 473, Reap. Dec. 10086).

Between March 1, 1952, and December 20, 1955, certain importations of high-speed precision lathes and accessory parts of West German manufacture were entered at the port of New York by appellants. The merchandise was appraised on the basis of foreign value, pursuant to 19 U.S.C.A., section 1402(c) (section 402(c), Tariff Act of 1930, as amended by Customs Administrative Act of 1938). Appellants appealed for a reappraisement of the merchandise by a judge of the United States Customs Court, contending the proper basis for appraisement to be cost of production under 19 U.S.C.A., section 1402(f) (section 402(f), Tariff Act of 1930), for the reason that foreign, export, and United States values for merchandise such as or similar to that imported were nonexistent at the times when the involved merchandise was exported.

The involved provisions of section 1402, *supra*, read as follows:

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

     *       *       *       *       *       *       *

(f) COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States, and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

The record in the case consists of two stipulations, five reports—one prepared by the American vice consul at Frankfurt, Germany, and four prepared by various Treasury Department representatives at Frankfurt, Germany, and two affidavits. It was conceded that there was no export or United States value for merchandise such as or similar to the merchandise at bar. It was also conceded that there was no foreign value for merchandise such as that here involved, by reason of the fact that the lathes exported to the United States underwent certain modifications to adapt them for use in the linear system of measurement, as opposed to the metric system of measurement employed in the home market. And, in the event that the trial court should be unable to find a foreign value for similar merchandise, it was stipulated that cost of production, as computed in the stipulation, would govern the valuation of the merchandise at bar. Although the trial court discussed at some length, in its opinion, the similarity of the merchandise sold in the home market to that imported, it seems to us that the only real issue is whether there were restrictions which

precluded a finding of foreign value, it having been conceded that similarity of merchandise existed.

The initial report which was before the trial court, exhibit A, concerns itself with an interview which took place at the premises of the manufacturer, Meuser & Co., on July 31, 1952, when the American vice consul at Frankfurt, Germany, interviewed a Miss Hasenfuss, the shop manager. To this report were annexed drawings and specifications of some of the manufacturer's line of merchandise, and various pricelists. A portion of this report is devoted to inquiries made at that time concerning foreign value of the subject merchandise. Apart from information detailed in the report concerning prices, terms of sale, discounts, packing charges, taxes, principal markets, and wholesale quantities, none of which information is at variance with information given in later reports, exhibit A also contains information on the subject of restrictions, the subject which most concerns us here. In this report, Miss Hasenfuss is said to have told the interviewer that "There are no restrictions of any kind imposed by the manufacturer on the buyers of this merchandise either as to resale or use."

Other reports were before the trial court from Treasury representatives which are at variance with exhibit A on the subject of restrictions. The first of such reports, exhibit F, covers an interview conducted by a Treasury representative at Frankfurt, Germany, with one Dr. Fritz Murkens, Meuser's office manager, at the factory on October 31, 1956. In this report, Dr. Murkens is said to have informed the interviewer that the manufacturer imposed both territorial and price restrictions on the sale and resale of the lathes in the home market, although such controls were not of a strict or inviolate nature. On the matter of restrictions, Dr. Murkens indicated here that Miss Hasenfuss "apparently did not fully understand the significance of 'resale and use.'" The report also contains what purports to be copies of letters taken from the manufacturer's files that are addressed to a number of German firms in September 1955 and at various times in 1956. The general tenor of these letters is that the manufacturer insists on the adherence by these firms to its list prices.

Some aspects of the information detailed in exhibit F are reiterated or supplemented in subsequent reports which, like exhibit F, were compiled from later interviews of Dr. Murkens conducted by Treasury representatives. In exhibit E, Dr. Murkens is reported to have stated, on December 16, 1957, that the aforesaid restrictions "have been enforced throughout most of the post-war period, and have definitely been in continuous effect from January 1, 1952," to the date of the interview. Again concerning Miss Hasenfuss, he indicated that she "did not comprehend the meaning of the term 'freely offered for sale' as it is used in the value provisions of the Tariff Act of 1930, as amended." He also promised to produce copies of letters from the

manufacturer's files relating to the existence of price and territorial restrictions from 1952 to 1956. In exhibit B, Dr. Murkens is reported to have given the Treasury representative filed copies of such letters in an interview held on March 13, 1958. These letters, three in number, are addressed to a number of German firms under various dates in October and November 1952. They refer to the manufacturer's awareness of sales made by such firms below its list prices and of the manufacturer's insistence that its list prices be adhered to in future sales.

Dr. Murkens is also the affiant in both of the affidavits which were before the trial court, designated collective exhibit D. In the first affidavit, sworn to on August 27, 1957, Dr. Murkens refers to himself as being the supervising manager of the manufacturer, while in the second affidavit, sworn to on January 16, 1959, he addresses himself as the director of administration. Both affidavits are also at variance with exhibit A on the subject of restrictions. In each affidavit, Dr. Murkens repeats statements he previously made to Treasury representatives concerning price restrictions affecting the resale of the lathes in the home market. Dr. Murkens further avers, in these affidavits, that the manufacturer's customers (dealers) limit their sales to buyers in their own areas. And, in the affidavit of August 27, Dr. Murkens refers to Miss Hasenfuss, though not by name, as having "misunderstood the technical exigencies of the US customs legislation."

On the matter of restrictions, the trial court gave full credence to the statements of Miss Hasenfuss, as contained in exhibit A, in its finding of foreign value, and very little, if any, credence to the several statements of Dr. Fritz Murkens, as contained in the other exhibits referred to herein. The court stated (p. 477):

The four additional reports and the affidavit which were received in evidence pertain to subsequent interviews with and statements by Dr. Fritz Murkens, office manager of Meuser & Co., wherein an attempt is made to refute the previous evidence on the ground that the statements of Miss Hasenfuss were given without a knowledge of the statutory requirements of foreign value, whereas Dr. Murkens claimed to be so informed by virtue of reading a brochure on United States customs valuation, which led him to the conclusion that cost of production should apply to the instant importations, for the reason that he considered sales in the home market to be on a restricted or a controlled basis.

The statements made by Dr. Murkens may be said to be an attempt to cut the cloth to the pattern, and the court is disinclined to consider them of sufficient evidentiary value to offset the presumption of correctness accompanying the appraiser's action, which finds corroboration in the statements of Miss Hasenfuss, reported in exhibit A, *supra*.

Appellants assign as error the trial court's preference of Miss Hasenfuss' statements over those of Dr. Murkens on the matter of restrictions and urge us to give full credence to Dr. Murkens' statements in reversing the judgment below.

As we view the record, the issue turns on the weight which is to be given to the various documents received in evidence. Appellants argue that the consular report, exhibit A, is somewhat brief on the subject of restrictions and that it is barren of evidence tending to qualify the person interviewed to give the information reported therein on the subject of restrictions. By contrast, appellants maintain that the Treasury reports, exhibits B, C, E, and F, are extensive in scope and detailed in nature and that they were prepared by persons who are skilled in the business of obtaining and analyzing the information sought pertaining to statutory value. This, according to appellants, makes the Treasury reports more creditable on the subject of restrictions than the consular report, which was relied upon by the appraiser and the trial court.

In our opinion, no case has been made out in the evidence for discrediting the consular report by reason of the manner or method of its preparation. Examination of the report reveals it to be comparable to the Treasury reports in style and mode of preparation. It reveals nothing of the claimed weakness or inferiority of content or draftsmanship which is implicit in appellants' argument. On the contrary, its greatest virtue appears to be its brevity, when it is compared with the Treasury reports, which, though more voluminous, all originate from the same source, namely, Dr. Fritz Murkens, and which vacillate on the subject of whether there were or were not restrictions on the sale of the involved merchandise in the home market. In any event, there is no evidence in the record which would support a conclusion that the terms "resale or use," "freely offered for sale," and "restrictions" were misunderstood either by Miss Hasenfuss or by the consular representatives who interviewed her. And, in the absence of such evidence, we cannot assume that these terms and their usage were misunderstood by such persons to the extent that use is made of these terms in the consular report. As such, appellants' arguments pertaining to so-called limitations in the preparation of the consular report must be regarded as being without merit.

There are other circumstances in the record which warrant consideration in connection with the issue before us. It will be observed that the consular report is contemporaneous with the exportation of the involved merchandise, whereas the preparation of the Treasury reports postdates the exportation of such merchandise. In any question of choice between conflicting sets of reports standing alone and unaided, as in the instant case, by other proofs, remoteness in point of time from the scene of action would naturally tend to influence the degree of reliability and accuracy attributable to the reporting sources. In the case at bar, this factor favors the consular report as being more reliable.

Moreover, we have not been convinced that the Treasury reports were prepared under a climate which left the reporting source altogether free from suspicion of motive which is suggestive of a lack of objectivity of purpose on the part of the informant. For example, in Treasury report, designated exhibit F, an attempt is made to establish the existence of restrictions in the home market through the use of the manufacturer's filed copies of letters sent to its dealers on the subject of restrictions. The letters that were produced were dated in September 1955 and at various times in 1956, which, of course, does not substantially cover the period of the subject exportations. When this fact became apparent, an effort was made by a Treasury representative to obtain from the manufacturer's files, if possible, additional copies of letters of the same tenor, but more contemporaneous to the involved exportations. Although Dr. Murkens promised to furnish these letters within a couple of days of the interview, months passed before such letters, three in number and each one dated in 1952, were produced at a subsequent interview, reported in exhibit B.

The reliability of the manufacturer's correspondence file as a basis for decision is further diminished, when we consider other statements in the Treasury report which produced the 1952 letters. Thus, exhibit B concludes:

Since April 25, 1957, the date Meuser was first contacted in order to conduct this inquiry, the latter firm repeatedly delayed supplying the information. Dr. Murkens invariably asked for time to prepare the data requested, consistently postponing meetings previously arranged. It was only with the utmost difficulty and after long and numerous conferences that the information contained in this report was finally obtained and compiled. * * *

Much reliance has been placed by appellants upon the *quantity* of evidence before the court as being persuasive on the issue. But our concern here is with the *quality* of the evidence in the record. In ascertaining the proper weight to be accorded to the various reports and affidavits, which were received in evidence in this case, no significance can be attached to the mere number of such reports and affidavits that one party or the other may have adduced in support of their respective contentions. (See *United States* v. *Stephen Rug Mills*, 12 Cust. Ct. 398, Reap. Dec. 5989, wherein both the trial court and the appellate division declined to give credence to five foreign reports placed in evidence by one of the parties.) Here, the consular report does not appear to be vulnerable to the infirmities which beset the Treasury reports, as observed herein.

Even if the Treasury reports and affidavits were to be given full credence, there would still be some doubt as to whether they disclose the existence of restrictions in the home market. According to statements contained in such reports and affidavits, all that appellants can

make claim to on the matter of restrictions is a desire on the part of the manufacturer to control sales of the lathes in the home market. Even the strongest of desires by a foreign manufacturer to control home market sales does not amount to a restricted market, in the absence of effective implementation of such desires. *United States* v. *Glanson Co.*, 47 CCPA 110, C.A.D. 740.

Apart from the matter of credibility and weight of the evidence, there are other circumstances in the record which warrant comment. One such circumstance has to do with the trial court's finding that only one affidavit was placed in evidence by the appellants with the four Treasury reports. As we have previously indicated herein, there were actually two affidavits of Dr. Murkens in the record. But the failure on the part of the trial court to refer to the second affidavit, in its opinion, is inconsequential, in view of the fact that one affidavit substantially repeats the averments of the earlier one. Another circumstance in the case concerns the trial court's finding that the appraiser's action was corroborated by Miss Hasenfuss. Actually, the record shows that the appraiser's finding of foreign value was predicated upon the report containing the statements attributed to Miss Hasenfuss. However, a single consular report, accompanied by pricelists, if deemed creditable, constitutes substantial evidence sufficient to support an appraiser's findings or the findings of the Customs Court pertaining to the existence of foreign value. *May Co. et al.* v. *United States*, 17 CCPA 190, T.D. 43644. Consequently, it would be of no moment if the trial court indicated a belief that the appraiser's findings of value were corroborated by the consular report, when, in fact, his findings of value were based on said consular report, since the trial judge accorded proper credence to the report.

For the reasons stated herein, we are of the opinion that the weight of the credible evidence in this case favors the consular report, designated exhibit A, on the subject of restrictions, and that the trial court properly gave credence to this report in finding that there were no restrictions on the sale of the involved merchandise in the home market.

We, accordingly, find as matters of fact that:

1. The merchandise covered by the reappraisement appeals, enumerated in the schedule attached to and made part of this decision, consists of metal lathes, imported from West Germany, between March 1, 1952, and December 20, 1955.

2. Merchandise similar to that imported was freely offered for sale for home consumption and in the ordinary course of trade, in the principal market in West Germany, at the manufacturer's factory in the City of Frankfort on the Main and in the usual wholesale quantities, consisting of one lathe and its accessory parts.

3. Such or similar merchandise was not freely offered for sale in the principal market of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States.

As matters of law, we conclude that:

1. The proper basis of value for the metal lathes and parts in controversy is foreign value, as that value is defined in section 1402(c), *supra.*

2. Said value is represented by the appraised values. The judgment appealed from is affirmed.

Judgment will be entered accordingly.

### CONCURRING OPINION

DONLON, Judge: I concur in the result, but not for the same reasons as those which my colleagues have stated in the principal opinion.

I agree that sheer numbers of reports or affidavits, if they are merely repetitive, do not tip the scales in weighing evidence. Our problem here is not quite so simple as that.

I find that exhibit A (report of the consular officer at Frankfurt, West Germany, on his interview with Miss Hasenfuss) is defective as proof because it states what, under tariff law, is a legal conclusion, and fails utterly to show facts as to sales practices on which the court could form its own conclusions of law.

What were the facts as to methods of sale, at wholesale, to domestic German buyers by Meuser? What were the facts as to sale of similar merchandise by other sellers, at wholesale, to domestic German buyers? Either Miss Hasenfuss did not say, or the consular officer failed to report it. The conclusion of law which he does report is without probative value.

However, appellee (defendant below) does not have the burden of proving those facts, unless and until appellants (plaintiffs below) have made out a *prima facie* case. The question is, has that case been made?

Do the reports of the Treasury agents make appellants' case for it? As Judge Richardson aptly stated, in *United States* v. *Baar & Beards, Inc.,* 40 Cust. Ct. 874, A.R.D. 85:

The importer may be relieved of the burden of proof usually required to overcome the presumption of the correctness of the finding of value by the appraiser, when the Government submits documents, as here, which contain evidence in support of the importer's claim. [P. 881.]

The agents' reports do, indeed, contain *some* evidence, i.e., facts rather than conclusions, and, on that basis, are entitled to credence as

evidence.  The difficulty is that, as the majority opinion points out, the facts shown do not relate to substantially the period of these importations.  Plaintiffs below failed to meet their burden of proof, even with defendant's reports.

For the reasons I have stated, I join in affirming the judgment below.