(Reap. Dec. 10654)

PARAMOUNT TEXTILE MACHINERY Co. v. UNITED STATES

Entry No. 3094.

(Decided December 24, 1963)

*Barnes, Richardson & Colburn (Joseph Schwartz* of counsel) for the plaintiff.
*John W. Douglas,* Assistant Attorney General (*Samuel D. Spector,* trial attorney), for the defendant.

DONLON, Judge: Two so-called "preboarding machines," exported from England in a knocked-down condition, were entered by plaintiff at Norfolk, Va., on December 27, 1960, and were appraised on the basis of foreign value.

It appears that the entry included both the two machines and certain spare parts. The valuation of the spare parts is not in dispute. The sole issue is as to valuation of the two machines. These are identified as machines for shaping hosiery, used in hosiery mills.

It has been stipulated that these machines are an article which appears in the final list promulgated under the Customs Simplification Act of 1956 and effective February 27, 1958, which was prior to the date this merchandise was imported. T.D. 54165. Therefore, appraisement is under old section 402, of the Tariff Act of 1930, renumbered by the 1956 act as section 402a.

It is plaintiff's claim that there is no foreign, export, or United States value for these machines and that appraisement should, therefore, be on the basis of their cost of production. Defendant concedes that there is no basis for determining an export value, but contends that there is a foreign value, and states that foreign value is the basis on which the machines were appraised.

As is too well known to require citation of authority, plaintiff's first burden of proof is to establish by affirmative proofs that there is not a foreign value for the merchandise, the absence of facts sufficient to form a basis for export value having been conceded by both parties.

Plaintiff introduced into evidence two affidavits. One was sworn to in England by Guy S. Helliwell, of Samuel Pegg & Son, Ltd., manufacturer-exporter of the instant machines. (Exhibit 1.) The other affidavit likewise was sworn to in England, but by Michael John Andrew of The Andrew Engineering & Development Co., Ltd. (Exhibit 2.) Plaintiff adduced the testimony of Mr. William P. Pope, described as now president of plaintiff corporation and previously, from 1941 to 1959, its executive vice president. Mr. Pope's testimony bears chiefly on the issue as to whether there was a basis for United States value. His testimony is not relevant to the first issue before the court, namely, whether there existed a foreign value.

Plaintiff's claim that it has borne its statutory burden of proving that there was no basis for foreign value, in England, must, therefore, be decided on the statements verified by Messrs. Helliwell and Andrew. Mr. Helliwell is associated with the British firm which made and sold these machines. Mr. Andrew is associated with another British firm, which also manufactures and sells preboarding machines to hosiery mills. Both affiants adequately qualify themselves as being acquainted, in the regular course of business, with the manufacture and sale of preboarding machines to hosiery mills in England, including such machines as those involved in this litigation.

Mr. Helliwell states that, during 1960, his company sold, or offered to sell, its preboarding machines in Great Britain "to factories, i.e., hosiery maufacturers or hosiery dyers, and not to dealers, stockists or distributors who would buy and sell or stock them on their own

account. All preboarding machines sold by my Company during the year 1960 were sold direct by my Company to the users namely hosiery manufacturers or hosiery dyers."

Mr. Andrew states that he is familiar with the preboarding machines manufactured by Pegg & Son "because they are competitive with our machines and I have frequently observed their machines in actual use." He goes on to say that the Pegg machines and the Andrew machines are "different," in that the machines "made by Samuel Pegg have a round or cylindrical steam chamber which when in use is lowered over the forms containing the hosiery and is then raised at the end of the preboarding process while the machines manufactured by my company have a rectangular steam chamber containing two sliding vertical doors which are opened and closed to allow the forms containing the hosiery to enter and leave the chamber."

It should be noted here that Mr. Helliwell agrees as to these differences; agrees, also, that the two machines are competitive; and states that The Andrew Engineering & Development Co. and his own company, Pegg & Son, are the only manufacturers of preboarding machines in Great Britain.

Mr. Andrew's statement as to offers of preboarding machines by his company, in the year 1960, is that the company made offers "only to ultimate users namely hosiery manufacturers or dyers and did not offer or sell said machines to stockists or distributors who would buy and sell or stock them on their own account."

Mr. Andrew described their British selling prices, which prices included without additional charge certain technical assistance, service, limited parts replacement, and installation of the first machine.

Mr. Helliwell stated that the British selling prices of Pegg & Son preboarding machines included similar, although not identical, items.

Defendant introduced into evidence certain exhibits, including a letter (collective exhibit C), dated September 29, 1959, from Mr. Helliwell, as managing director of Pegg & Son, to James H. Lundquist, Esq., with attached statement in reply to a questionnaire, said to have requested information as to Pegg's pricelists, sales, etc.

From the record, as it pertains to the issue of foreign value, it appears that preboarding machines were sold and offered for sale in England by the two manufacturers of such machines to hosiery mills and hosiery dyers, and that such sales and offers were made directly by the manufacturers and not by jobbers, wholesalers, or other middlemen. It appears, also, that these machines are used in the making of hosiery, and that they are constructed in accordance with standard specifications. (Def. collective exhibit C.)

Plaintiff argues that, on this record, it has shown that the machines were not freely offered in the home market, England, to *all* purchasers,

but only to users, that is, to hosiery manufacturers and hosiery dyers; and that, under these circumstances, there was not the free offering which section 402a(c) contemplates. In support of this argument, plaintiff cites *United States* v. *Mexican Products Co.*, 28 CCPA 80, C.A.D. 129, and seeks to distinguish *Rico, Inc.* v. *United States*, 48 CCPA 110, C.A.D. 773.

The *Mexican Products Co.* case illustrates the fallacy of citing particular language only, without reference to the issue the court was there considering. The issue was not, as here, which of the statutory bases of appraisement was proper to the case, but solely as to computation of value. The trial court had found that dutiable values were the manufacturer's list prices, less a discount of 10 per centum, plus packing. Our appeals court held that this finding, as to the item of discount, was not supported by substantial evidence. The question was whether that discount was available to all purchasers. The record disclosed that it was not. The court held that a lower price which is offered only to some purchasers, even when those are a major portion of all customers, is not the market value or price which the statute requires as the basis from which computation of foreign and export value proceeds. The court was not asked to consider, and did not, as to what kinds of customers were in the market for the involved Mexican glassware. Notwithstanding a record that disclosed different prices offered to different customers, the court found that there was a basis for finding foreign or export value and found, also, what that value was.

As to the *Rico* case, *supra*, which plaintiff's brief discusses, the question was whether whole, frozen strawberries, packed in 27- and 29-pound tins, were freely offered to all purchasers, in the section 402 sense, since the record showed that they were sold to so-called institutional buyers or to manufacturing trades, such as the bakery and ice cream industries, and to processors and preservers; and that retail grocers and individual purchasers did not buy frozen strawberries except in much smaller packages, as the appeals court said "for obvious reasons." *Idem*, page 112.

While the appeals court said that the record did not show that the manufacturer actually refused to sell big tins of strawberries, in Mexico, to retailers and individuals, the court also held that a "restriction inherent in the packaging of the goods which results in only a certain class of customers desiring to purchase such goods is not a restriction upon offering for sale." *Rico, Inc.*, *supra*, at page 112.

In *United States* v. *American Glanzstoff Corp.*, 24 CCPA 35, the appeals court found, reversing the court below, that there was a foreign market for the involved merchandise, but found also that value had not been properly computed, and remanded the cause for cor-

rection of the judgment. That the merchandise was sold only to members of an association was a fact accepted by the appeals court, as evidenced by the following excerpt from its opinion, referring to the decision below:

The appellate division was of the opinion that the "loyalty" discount should be deducted in fixing foreign value because, although there was, "a clause with reference to disallowance of the loyalty discount, it was not exercised, as there was no purchaser outside members of the syndicate." [P. 37.]

To the same effect is the following from the opinion of the appellate division:

The Government contends that to nonmembers of the Rayon Syndicate this discount is not allowed, and in the evidence there is some intimation to that effect; but, in fact, all purchasers of this merchandise are members of the syndicate, and therefore all receive the discount. [68 Treas. Dec. 1305, Reap. Dec. 3677, at page 1306.]

We are not to assume, on this record, that the courts were in error in finding, as they both did find in the *Glanzstoff* case, that a basis existed for finding statutory foreign value on a record that showed sales were made only to members of an association, or a syndicate.

More recently, the courts had occasion to consider whether a table lighter was freely offered to all purchasers, within the meaning of section 402a (in that case, to all purchasers in the United States, the basis of appraisement being United States value). *Sani Smoke, Inc.* v. *United States*, 47 Cust. Ct. 483, Reap. Dec. 10089; *idem*, 49 Cust. Ct. 505, A.R.D. 148; *idem*, 50 CCPA 82, C.A.D. 825.

As trial judge in *Sani Smoke*, I reviewed the holding in *United States* v. *American Glanzstoff Corp.*, *supra*, and said:.

In the *Glanzstoff* case, our appeals court defined the expression "all purchasers" to mean "all of those who cared to buy such goods in such markets." The record here does not show that anyone who cared to buy could not do so. Indeed, plaintiff's witness testified that he had no objection to selling the lighter to any and all jobbers. It is true that plaintiff solicited the trade of certain customers, but this is generally true where novel or unusual merchandise is being introduced and its sales value tested. [47 Cust. Ct., at p. 487.]

The appellate division affirmed, stating:

We conclude, in agreement with the trial court, that appellant (plaintiff below) "has not shown that there were not free offerings of such lighters in the United States, such as section 402(e) contemplates." [49 Cust. Ct., at p. 509]

Our appeals court held that there was substantial evidence to support the appealed decision; that the court below did not commit reversible error. The appeals court cited, with apparent approval, opinion language of the appellate division to the effect that, on the facts of the case, "the marketing of the involved merchandise to particular or selected purchasers did not create or establish 'a restriction upon offering for sale.'" *Sani Smoke, Inc.* v. *United States*, 50 CCPA 82, at page 84.

On the facts of record here, it has been shown that the English seller of these machines and its sole competitor in England freely offered preboarding machines, in the home market, to all who were likely customers of such highly specialized machines. The argument advanced by plaintiff here, like that of plaintiff in *Rico, supra*, should tend toward an interpretation that Congress, in enacting the valuation section, intended to provide that foreign and export values, the primary bases for valuation, were to be used for appraisement only in the case of goods with broad customer acceptance. There is no reason, either on the cited cases or the proceedings in Congress, to conclude that Congress intended so narrow a construction. Where, as here, the proofs of record show free offerings and sales to all those purchasers who were in the market to buy the goods, the statutory test has been met.

Plaintiff further argues that, even if it should be held that a market existed in England for assembled preboarding machines, it has not been shown that there was a market for such machines, knocked-down, which is the form in which the instant machines were imported. As authority for the distinction, plaintiff relies on *United States* v. *Draeger Shipping Co., Inc.*, 29 CCPA 258, C.A.D. 199, and *E. Dillingham, Inc.* v. *United States*, 46 Cust. Ct. 771, A.R.D. 129.

Before discussing the cited cases, it should be observed that the assumption on which plaintiff's argument rests is not correct. I shall return later to consideration of that point.

In the *Dillingham* case, *supra*, cited by plaintiff, machines were offered in Canada in two different ways. They were offered at advertised list prices, plus a fee for installation, so that customers received a completely assembled, installed, electrically hooked-up, warranted unit; but units, unassembled, uninstalled, and unwarranted, were also offered to selected customers at list prices, less a discount. There was no controversy as to existence of foreign value, but only as to its computation.

A majority of the appellate division found that since "the record before us will not support a finding of foreign value; since the case was presented to us solely on the theory that there was a foreign value; and since the evidence as to cost of production is meager and was not considered by the trial judge, the decision and judgment of the trial court are reversed, and the case is remanded to the trial court for further proceedings, including the introduction of additional evidence as to cost of production."

On remand, plaintiff abandoned the appeal. The net effect of the *Dillingham* case, therefore, is that the record was not further developed on any of the issues considered by the appellate division, and final appraisement was on the basis of foreign value.

In *United States* v. *Draeger Shipping Co., Inc.*, 29 CCPA 258, C.A.D. 199, absence of both foreign and export values was conceded. Appraisement was on the cost of production in Sweden. The importer appealed, claiming on trial that, although the appraiser was right in holding that cost of production was the proper basis of appraisement, he erred in computing that value.

The Government counterclaimed that United States value, and not cost of production, should be the basis of appraisement, notwithstanding the action of the appraiser. The first question, then, was whether there was United States value. The trial court found there was no United States value, and recomputed the cost of production to accord with plaintiff's claim. The Government then appealed.

Our appeals court held that unassembled calculating machines, such as the merchandise there involved, were neither sold nor freely offered for sale in the United States; that, after importation, the parts were taken to the importer's factory and there assembled into complete machines; that, when so assembled, they were freely offered for sale and sold in the United States at the same price as the price asked and received for machines of the same model that were imported in an assembled condition; and that the value of the imported parts was substantially less than the price at which imported assembled calculating machines were offered for sale in the United States. Citing *United States* v. *H. W. Robinson & Co.*, 25 CCPA 395, T.D. 49484, the court held that machines which were imported as unassembled parts did not have a United States value, because it was shown that there was no market in the United States save for such machines after they had been assembled in the importer's factory.

That, of course, is not the situation here. The question before the court is, was there a market in England for unassembled, but complete, preboarding machines, such as those imported here?

Mr. Helliwell's affidavit (exhibit 1) states that his "company's selling prices of preboarding machines during the year 1960 included the following, without additional charge:

1. Service for first 12 months.
2. Replacement of parts for 6 months.
3. Installation of first machine.
4. Advice on power supply.
5. Layout drawings for installation."

Mr. Andrew stated (exhibit 2) that his "company's selling prices of preboarding machines during the year 1960 included the following without additional charge:

(1) Technical advice on steam air and power supply.
(2) Preparation of layout drawings for installation.
(3) Service visits for six months after delivery to users' premises by service engineers or technical representatives.

(4) Replacement of parts for six months.

(5) Installation of first machine."

Mr. William P. Pope, testifying for plaintiff, said that included in his company's sales were several service items, including supervision of installation, warranty for 1 year, replacement of unsatisfactory parts, and engineering services. (R. 22.)

It is evident that similar services in the buyer's factory were performed on preboarding machines sold in England and in the United States. While there is not in the record precise testimony that, in both countries, sale was made of a knocked-down but complete machine, the fact is clear that services were rendered without additional charge which are related to the assembly and installation of the machine on the buyer's premises. Such testimony would appear inconsistent with a situation where shipment was made of preboarding machines already fully assembled.

I find the machines sold in England were such machines as those here involved. There exists a basis for foreign value of the unassembled, but complete, preboarding machines of this appeal.

What that value is, remains for consideration. Foreign value of the unassembled, but complete, machines should not include a price charged for services rendered to assemble and install the machine in the buyer's factory. However, the record here shows that such services were given "without additional charge."

Finding that plaintiff has not negatived the existence of foreign value as the basis for appraisement, and also has not shown such a value different in amount from the appraised value, plaintiff's burden of proof has not been met. This obviates review of plaintiff's proofs that are intended to show that there existed no basis for finding United States value, and those proofs showing the cost of production of the unassembled machines. Plaintiff adduced no proofs controverting the *amount* of foreign value, as that value was found by the appraiser. Hence, the statutory presumption of correctness prevails.

I find as facts:

1. That the merchandise of this appeal consists of two so-called "preboarding machines," used for shaping hosiery, which were exported from England in a knocked-down condition and imported on December 27, 1960.

2. That, at the time of exportation, such merchandise was freely offered for sale in the ordinary course of trade in England for home consumption to hosiery mills and hosiery dyers, and that these are the only purchasers who were in the market for such machines.

3. That such machines were sold in England for home consumption in the same condition as that in which they were imported into the United States, namely, knocked-down; that the trade practice there

was that assembly, installation, and certain other services were performed in the plant of the hosiery mill or hosiery dyer buyers.

4. That, at the time of exportation from England, such machines were freely offered for sale for home consumption in England, and that services of the seller, including assembly and installation of a first machine, and certain other specified services, were performed without additional charge beyond the price of the merchandise.

5. That the merchandise was appraised on the basis of foreign value under section 402a(c) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

I conclude as a matter of law:

1. That the facts established by plaintiff's proofs fail to overcome the presumption of correctness which attaches to the appraised value.

2. That foreign value, as defined in section 402a(c) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for appraisement of the two preboarding machines of this appeal.

3. That, on the evidence of record, plaintiff not having overcome the presumption that appraisement was correct, the foreign value of the two preboarding machines of this appeal is the appraised value.

Judgment will enter accordingly.