(A.R.D. 202)

PARAMOUNT TEXTILE MACHINERY CO. *v.* UNITED STATES

Entry No. 3094.

First Division, Appellate Term

(Decided March 16, 1966)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the appellant.
*John W. Douglas,* Assistant Attorney General (*Samuel D. Spector,* trial attorney), for the appellee.

Before OLIVER, WILSON, and NICHOLS, Judges; NICHOLS, J., concurring

WILSON, Judge: This is an application for review of the decision and judgment of a single judge sitting in reappraisement (52 Cust. Ct. 392, Reap. Dec. 10654) in which the trial judge affirmed the appraised values of the involved merchandise.

The merchandise consists of two so-called "preboarding machines," exported in a knocked-down condition from England on December 5, 1960, and entered at the port of Norfolk, Va. The merchandise was

761

appraised at £1750.00 each, plus spare parts, plus cases and packing, on the basis of foreign value, as defined in section 402a(c) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. The importer claimed below as it does here that the correct dutiable value of the involved merchandise was £1484.00, plus cases and packing of £102.00, plus £30.00 for delivery to port of embarkation, plus spare parts valued at £374.16.0, on the basis of cost of production, as defined in section 402a(f) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. Counsel for the respective parties agreed that the merchandise is described on the Final List of the Secretary of the Treasury, T.D. 54521, and thus subject to appraisement under section 402a(c) of the act, as amended, *supra*, or under section 402a(f) of said act, as amended, *supra*. It was further agreed that there was no export value for the involved merchandise (R. 3, 6).

The provisions of the statutes herein involved are as follows:

Section 402a(c) of the Tariff Act of 1930, as amended, *supra:*

FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402a(e) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

Section 402a(f) of the Tariff Act of 1930, as amended, *surpa:*

COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

> (1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of ex-

portation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

At the trial, plaintiff below called as its witness Mr. William P. Pope, president of the importing company. He testified that his firm makes textile machinery, primarily for the hosiery industry, and makes other articles, as well as importing from Samuel Pegg & Son, Ltd., manufacturer of the machines here in question. He further testified that the practice of his firm was to sell "only to responsible hosiery manufacturing concerns" (R. 14), and that these machines were offered by his company only to hosiery manufacturers and that he did not offer these machines at any time to machinery dealers or jobbers (R. 19). Mr. Pope stated that there was not, during 1960, any other importer of preboarding machines in the United States and that the imported machines were imported in a "knocked-down" condition (R. 24).

In support of its contention that there was no foreign value for the involved merchandise, plaintiff, at the trial below, introduced in evidence two affidavits. Plaintiff's exhibit 1 is an affidavit of Guy S. Helliwell of Samuel Pegg & Son, Ltd., manufacturer-exporter of the machines in question. Plaintiff's exhibit 2 is an affidavit of Michael John Andrew of Nottingham, England, chairman of the board of The Andrew Engineering and Development Co., Ltd., a competitor of the manufacturer herein. As pointed out by the trial court, both affiants adequately qualified themselves as being acquainted, in the regular course of business, with the manufacture and sale of preboarding machines to hosiery mills in England, including such machines as those here involved.

For the purposes of the present review, it may be stated that plaintiff's exhibit 1, *supra*, discloses that, during 1960, the exporter of the involved machines sold, or offered to sell, its preboarding machines

in Great Britain "to factories, i.e., hosiery manufacturers or hosiery dyers, and not to dealers, stockists or distributors who would buy and sell or stock them on their own account"; that all preboarding machines sold by the exporter during the year 1960 were sold direct by that company to the users, namely, hosiery manufacturers or hosiery dyers. Plaintiff's exhibit 2 likewise sets forth that offers of preboarding machines by The Andrew Engineering and Development Co., Ltd., were made "only to ultimate users namely hosiery manufacturers or dyers and did not offer or sell said machines to stockists or distributors who would buy and sell or stock them on their own account." The aforesaid affidavits further disclose that the exporter herein and The Andrew Engineering and Development Co., Ltd., are the only manufacturers of preboarding machines in Great Britain; and further, that while there are differences in the makeup of the machines manufactured by these two companies, such differences do not affect the use for which the machines are employed, namely, as machines for shaping hosiery, used in hosiery mills. The affidavits indicate that the selling prices of the Andrew's machines include without additional charge certain technical assistance, service, limited parts replacement, and installation of the first machine sold to purchasers by the company, and, further, that the selling prices of the manufacturer herein included similar, although not identical, items.

The trial court held that on the facts there presented, it was established that the English seller of these machines and its sole competitor in England freely offered preboarding machines, in the home market, to "all who were likely customers of such highly specialized machines," and that "Where, as here, the proofs of record show free offerings and sales to all those purchasers who were in the market to buy the goods, the statutory test has been met." In so holding, the trial court relied upon the reasoning advanced by our appellate court in the case of *Rico, Inc.* v. *United States*, 48 CCPA 110, C.A.D. 773, as to which the trial court considered that a situation similar to that obtaining in the case at bar was present in the cited case.

The appellant herein contends, as it did before the trial judge, that in the present case there was a voluntary, arbitrary exclusion from the market of certain potential or prospective customers or classes of customers, such as dealers in machinery or distributors of machinery, by a deliberate refusal to sell to them on an equal footing with the hosiery manufacturers or dyers by the exporter of *such* preboarding machines and by its only competitor of *similar* preboarding machines. Appellant, accordingly, maintains that preboarding machines such as or similar to those herein involved were not being freely offered for sale for home consumption to all purchasers as required by section 402a(c), *supra*.

In the *Rico, Inc.*, case, *supra*, the question was whether whole, frozen strawberries, packed in 27- and 29-pound tins, were freely offered to all purchasers within the requirements of section 402 (d) of the Tariff Act of 1930. The record therein showed that the merchandise in question was sold to so-called institutional buyers or to manufacturing trades, such as the bakery and ice cream industries, and to processors and preservers. It further appeared therein that retail grocers and individual purchasers did not buy frozen strawberries except in much smaller packages, as our appeals court said "for obvious reasons." In holding that the involved merchandise was freely offered to "all" purchasers, that is, as stated by our appellate court, "all those who care to buy such goods in such markets," the court in the *Rico* case, *supra*, at page 112, stated:

In the present case there is no evidence of any instance of a refusal to sell Mexican, whole, frozen strawberries packed in the large tins to the retail trade or to anyone else, and the appellant's argument that "all purchasers" means exactly that and not merely "all those who care to buy such goods" could be accepted without changing the conclusion reached by the Customs Court.

It may be true that retailers and individuals are not in the class of "those who care to buy" the big tins of strawberries, but there is no evidence to show that the manufacturer would refuse to sell to them. "Offered for sale" does not require active solicitation of customers, nor does it require that the goods be so packaged as to meet the needs of all customers. A restriction inherent in the packaging of the goods which results in only a certain class of customers desiring to purchase such goods is not a restriction upon offering for sale. It would seem that to defeat the conception of a free offering the restriction would be one involving some form of marketing practice resulting in the arbitrary exclusion from the market of certain customers or classes of customers by a refusal to sell to them on an equal footing with others, or at all.

We are in agreement with the finding of the trial court that the involved merchandise was freely offered to all purchasers, and that there was a foreign value for the imported machines, represented by the appraised value. In our opinion, the offers and sales of these machines to hosiery manufacturers or dyers did not constitute such a restriction so as to preclude a finding of foreign value for the involved merchandise. In this connection we deem inapplicable the holdings of the court in the cases of *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, T.D. 42216, and *Kuttroff, Pickhardt & Co.* v. *United States*, 12 Ct. Cust. Appls. 299, T.D. 40313, cited by the appellant herein in support of its contention that there was no foreign value for the involved merchandise.

The principles of a restricted market have been confined to restrictions other than those here considered, such as restriction to any class

of buyers, percentage of buyers, or to a designated territory. *United States* v. *American Glanzstoff Corp.*, 24 CCPA 35, T.D. 48308; *United States* v. *Heemsoth-Kerner Corp.* (*Bauer Type Foundry, Inc.*), 31 CCPA 75, C.A.D. 252. There is no proof in the record herein that offers to purchase any of the products of the exporter by dealers, stockists, or distributors were rejected by the involved exporter. In the case of *D. C. Andrews & Co., Inc., et al.* v. *United States*, 50 Cust. Ct. 521, A.R.D. 151, the court stated (page 527):

> * * * Even the strongest of desires by a foreign manufacturer to control home market sales does not amount to a restricted market, in the absence of effective implementation of such desires. *United States* v. *Glanson Co.*, 47 CCPA 110, C.A.D. 740.

As was stated by the court in the case of *Sani Smoke, Inc.* v. *United States*, 47 Cust. Ct. 483, 487, Reap. Dec. 10089:

> * * * The record here does not show that anyone who cared to buy could not do so. * * * It is true that plaintiff solicited the trade of certain customers, but this is generally true where novel or unusual merchandise is being introduced and its sales value tested.

Under the applicable circumstances in the case at bar, the sale of these machines by the manufacturer herein to hosiery and manufacturing concerns and dyers, constituting the ordinary course of trade in the sale of these products, did not negate a finding of foreign value for the involved merchandise. Specifically, the free offering of the merchandise at bar is further established, in our opinion, by the price list promulgated by the exporter herein (defendant's collective exhibit B) wherein machines similar to those sold for exportation to the United States are named and described, without any words of restriction or exclusion of any class of purchasers.

By reason of the conclusion reached here, we deem it unnecessary to discuss at length the application of the United States value to the imported merchandise, the plantiff-appellant having in the first instance the burden of overcoming the presumption of correctness attaching to the appraiser's finding that there was a foreign value for unassembled but complete, preboarding machines such as those here imported.

For the reasons above stated, the decision and judgment of the trial court sustaining the appraiser's return of value herein are affirmed, and the findings of fact and conclusions of law set forth in said decision are herein adopted.

Judgment will be entered accordingly.

### CONCURRING OPINION

Nichols, Judge: I agree with the court's opinion, but I am concerned with its failure to deal with, or even mention, authorities

heavily relied on by appellant. In my view, an opinion loses much of its value if it does not afford affirmative evidence that the court has considered, and believes it has followed, should not follow, or can distinguish, pertinent cases cited to it.

The best support appellant has for its contention that the English home market for this merchandise is restricted, is *United States* v. *F. W. Myers & Co., Inc.*, 24 Cust. Ct. 553, Reap. Dec. 7798. In that case, the machines involved were sold, according to a Government report "to manufacturers only, who used these machines in their own business," and Judge Lawrence held for the second division "It is a clear statement of fact that the market for home consumption in Canada for these machines was one '* * * in which sales were limited to a particular class of purchasers.'" This court may have supposed that the later *Rico, Inc.* v. *United States*, 48 CCPA 110, C.A.D. 773, is inconsistent to a degree making *Myers* worthless as authority. Furthermore, the situation respecting burden of proof was not the same there as here. There, the Government had appealed for reappraisement and so had to sustain the burden of proof. The Government's own report was, naturally, construed against it, and was susceptible to the interpretation given, though not, I should say, without ambiguity. Here, the appellant bears the burden of proof to establish that the appraiser erred in basing appraisement on foreign value. Plaintiff below tenders two affidavits stating that the machines in the home market are not sold or offered to all purchasers, but only to factories. The court holds that this fails to allege that "stockists" or dealers who wished to buy at the established list price (an unlikely contingency) "were rejected." It construes the affidavits, which are ambiguous, against the party who tendered them, and who bore the burden of proof. I agree. If plaintiff's astute counsel had been able, consistent with truth, to produce stronger affidavits, who can doubt he would have done so?

It seems entirely right and proper that in considering reports and affidavits under the statute we do not regard them as if they were sworn testimony subject to cross-examination, but interpret uncertainties and ambiguities in light of which side prepared them and who must overcome a presumption. They may lead to very similar statements being oppositely construed in different cases. I do not consider the *Myers* case, *supra*, as really in conflict with the result we reached herein.

The court also does not discuss *E. Dillingham, Inc., et al.* v. *United States*, 46 Cust. Ct. 771, A.R.D. 129, though plaintiff regards it as strongly supporting its position that the knocked-down machines exported were not "such or similar" to machines serviced for 6 months, with other benefits, as sold in the home market. In *Dillingham*, the machines were for use of irradiated cobalt in cancer diagnosis and

therapy; the safety of patients and hospital staff demanded that the maker exercise the most careful and detailed control over the installation. Unassembled machines could be bought only for export and by a handful of qualified distributors: the machines in litigation were among those unassembled exports. The court held that the sales at home were not of merchandise such as or similar to that exported, citing *United States* v. *Draeger Shipping Co., Inc.*, 29 CCPA 258, C.A.D. 199.

Evidently there has to be a value distinction between an article knocked down for shipment and unassembled parts of the article. In *Draeger*, the substantial value to be added to the parts by assembly was a factor in the decision. In *Dillingham*, the value of assembly and other services offered only in the home market was not available to the court but was obviously substantial. I do not believe these cases are authority that *de minimis* advantages given home market buyers were meant by Congress to preclude a finding of "foreign value" wherever they occur.

I note that under the Antidumping Act of 1921, 19 U.S.C., section 161, as amended in 1958, 72 Stat. 583, the comparison between "foreign market value" and "purchase price" or "exporter's sales price" is to be made in light of "differences in circumstances of sale." No like provision is made in the statutory provisions for ordinary appraisement. The obvious reason is that value for dumping duties must be more finely measured because the impact of the duties is so much more severe. From the absence of reference to "difference in circumstances of sale" in the provisions for ordinary appraisement, I infer that such differences are normally to be disregarded if *de minimis*, and until they reach the extremes in *Dillingham, supra*, making the home market merchandise not "similar." It is to be expected there will be some differences almost always. Customers in the home country can demand more and different services and concessions from the producer simply because he is there.

Here, we know about the circumstances of sale in the British home market only by the same *ex parte* affidavits already discussed. The price list does not mention them, and even in the affidavits they are merely mentioned, not evaluated or described in detail. They are stated to be installation of the first machine bought, service for 12 months, furnishing of layout diagrams, replacement of parts for 6 months, etc. They would appear to be "circumstances of sale" for which no adjustment provision is made. The value is not disclosed, expressly or by inference, except the inference the trial judge draws, I think rightly, from the fact that no charge is made for them. I would hold that these services do not preclude the existence of a statutory foreign value unless appellant establishes that they are

substantial, as to which the burden is on it.  The presumption is that the appraiser considered the differences and found they were not too substantial.

The other cases appellant cites have been examined, and found to bear less directly on the issues herein.  No purpose would be served by discussing them in detail.