(C. D. 829)

GRAEMIGER BROS., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 2, 1944)

John D. Rode (Howard C. Carter of counsel) for the plaintiff.
Paul P. Rao, Assistant Attorney General (Richard E. FitzGibbon, special attorney), for the defendant.

Before Tilson, Kincheloe, and Lawrence, Judges

Lawrence, Judge: This case was originally decided adversely to plaintiff (9 Cust. Ct. 212, C. D. 696). It is again before us as the result of a rehearing, and has been resubmitted upon a stipulation placing in evidence four illustrative exhibits, as well as the original record herein.

The mechanism in controversy was advisorily returned by the appraiser as an "Old & Used Textile Finishing Machine." The collector classified it under the provision in paragraph 372 of the Tariff Act of 1930 for "all other textile machinery, finished or unfinished, not specially provided for," and levied duty thereon at the rate of 40 per centum ad valorem.

The protest of plaintiff invokes the following claims under said act for rates of duty lower than that assessed:

1. 35 per centum ad valorem under paragraph 353 as articles having as an essential feature an electrical element or device, or parts thereof, finished or unfinished.

2. 27½ per centum ad valorem under paragraph 372 as machines or parts thereof not specially provided for.

3. 25 per centum ad valorem under paragraph 372, by virtue of the trade agreement with the United Kingdom (74 Treas. Dec. 253, T. D. 49753).

4. 25 or 27½ per centum ad valorem under paragraph 353, by virtue of said trade agreement.

While all of said claims were pressed when the case was first decided, nevertheless, plaintiff, in its brief, now stresses only the claims that the merchandise is dutiable at the rate of 27½ per centum ad valorem under paragraph 372 as a machine or parts thereof not specially provided for, or, at the same rate of duty under paragraph 353, as modified by said trade agreement, as—

Machines having as an essential feature an electrical element or device and which would be dutiable under paragraph 372, Tariff Act of 1930, if of a kind which could be designed to operate without such electrical element or device * * *

all the foregoing, not specially provided for, finished or unfinished, wholly or in chief value of metal, and not provided for heretofore in any item numbered 353 in this schedule.

However, none of the other claims in the protest has been specifically abandoned.

The only testimony submitted herein is that of Frederick A. Ramig, who appeared for plaintiff. He stated that since 1930 he has been president of the plaintiff-corporation; that his duties relate to "management, importation, buying and selling"; and that the imported mechanism is a "cutting machine, scallop-cutting machine." He produced a picture, received in evidence as illustrative exhibit 1, representing the machine set up ready for operation.

Based upon 40 years' familiarity with these machines in the United States and Europe, the witness testified in substance that cotton cloth, which has been bleached, finished, and mercerized, is then embroidered into the form or shape of scalloped handkerchiefs in the piece. In that condition the cloth is fed into a machine like the one before us, which cuts the handkerchiefs on two of the embroidered or scalloped edges; that "the machine can cut out four sides, but we find it more advantageous to cut the other two sides by hand, as we would have to stop the machine too frequently." As imported the machine had bolted thereon an electric motor which furnishes the operating power.

The four exhibits introduced by plaintiff on the retrial are marked in evidence as plaintiff's illustrative exhibits A, B, C, and D, respectively, and consist of—

A—a piece of cotton cloth, bleached, finished, and mercerized, in the condition as purchased by plaintiff.

B—a portion of A after it has been embroidered on an embroidery machine which establishes the identity of the handkerchiefs in the piece.

C—a portion of B after it has been cut by the scallop-cutting machine in controversy.

D—one of the handkerchiefs after it has been completely finished by cutting C by hand.

It is clear from the evidence that the imported machine does not completely cut apart the handkerchiefs. It cuts but two of the scalloped sides of the handkerchiefs in the piece, leaving the other two sides to be cut by hand.

On these facts we shall proceed to determine whether the importation is properly dutiable at the rate of 40 per centum ad valorem under said paragraph 372 as textile machinery not specially provided for, as classified by the collector, or at one of the lower rates claimed by plaintiff.

In our former decision (C. D. 696, *supra*) we stated that—

* * *. The present situation is somewhat like that involved in the case of *United States* v. *Asten Hill Mfg. Co.*, 25 C. C. P. A. 123, T. D. 49243. There the

machines in question made complete belts for use in paper-making machines. As stated in the syllabus to said decision:

The fact that the belts are completed articles, ready for use, when they leave the loom, and not belting, does not exclude the loom from classification as *textile machinery*. The provision for textile machinery is sufficiently comprehensive to cover *all* textile machinery not otherwise specially provided for   *   *   *. Citing *Whitlock Cordage Co.* case, *supra*.   [Italics quoted.]

We accordingly held that the collector properly classified the importation as textile machinery.

Upon a more mature consideration of the facts and a careful study of leading authorities on the subject, particularly the case of *Whitlock Cordage Co.* v. *United States*, 13 Ct. Cust. Appls. 656, T. D. 41490 (decided in March 1926), we are of opinion that the instant machine may not properly be classified as textile machinery. That case arose under the Tariff Act of 1922, in which appeared for the first time a provision for "textile machinery." One of the questions presented was, did the provision cover rope-making machinery? The appellate court said:

The "breaker card," the "third and finishing drawing frame," and the "regulating gill spinning frame" are used in the manufacture of yarn, which is a textile material, and, therefore, they, and the parts therefor, are included within the provision for all other textile machinery. The "24-spindle patented twister" is used in twisting the yarn into strands, and the strands into rope. Its function is to manufacture a textile material into a product which is not a textile, either within the strict definition of that term, or within the broader construction here placed upon the statute. Nor does it process or otherwise make textile materials available for textile uses. We are of opinion that such machinery is not textile machinery, and that it was not intended to be included within the provisions therefor.

Under that ruling, mechanisms which do not manufacture textile material, or process or otherwise make it available for textile uses, have been consistently denied tariff classification as textile machinery in subsequent litigation arising under the Tariff Acts of 1922 and 1930, the pertinent provisions being substantially the same in each act.

Four years later the same court decided *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. (Customs) 459, T. D. 43916, a case which also arose under the act of 1922. It involved certain wool openers, dessuinters, and dryers, used in tearing apart the fleeces of raw wool, washing, cleaning, and drying it. As to whether or not the collector had correctly classified the mechanisms as textile machinery, the court remarked that "this question does not appear to be difficult, in view of what we have heretofore said on the subject." After quoting from the *Whitlock Cordage Co.* case, *supra*, the court observed:

We thus expressed the opinion that the phrase "all other textile machinery" includes machines which are used in the *manufacture* of textile materials.

If this be the test, and we think it is, are the machines imported here used in the *manufacture* of textile materials? Obviously, they are not. Ever since the creation of this court it has held, consistently, that the mere cleansing of an article

or "getting it by itself," is not a manufacturing process. This rule is so well understood that it requires no elaboration here. * * *. Therefore, these machines are not used in the manufacture of textile materials, and, it follows, are not textile machinery within the meaning of the paragraph. [Italics quoted.]

The latter case was cited in *Jett & Co.* v. *United States*, 18 C. C. P. A. (Customs) 86, T. D. 44044, but the manner in which it was referred to would indicate that it must not be construed beyond the limit of the facts on which it was predicated. The court said:

We would first observe that it is conceded, and the testimony clearly shows, that none of the machines in question is used for the purpose of washing, cleaning, or bleaching the cotton linters which are the raw material employed in the manufacture of artificial silk yarn, which is clearly a textile material. Therefore the case of *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. 459, T. D. 43916, in which it was held that certain machines used in cleaning wool were not textile machines, does not in any way aid appellant's contention that the machines in issue are not textile machines.

Discussing the functions of the machines there under consideration, the court observed:

* * *. They are used exclusively in the manufacture of artificial silk, which is of course a textile material. The process performed by each of the machines is essential in the manufacture of such material. In our opinion it is wholly immaterial that the processes resulted in the creation of a new fiber. The raw material utilized in the beginning is a textile fiber. The manufactured article, the result of a large number of processes between the raw textile fiber and the finished product, is artificial silk yarn. Thus the manufacturing processes begin by utilizing a textile fiber and end with an artificial silk yarn. It is immaterial whether in such processes the original fiber has been destroyed and a new fiber created. It is likewise immaterial that the machines in question do not perform all of the manufacturing processes necessary in the production of the yarn. All of them were used in its manufacture. The manufacture of the yarn begins with one of the machines in question and the sole end of the processes employed is the production of artificial silk yarn.

We hold that the machines in issue are used in the manufacture of a textile material. They are therefore textile machinery and were properly classified by the collector.

The *Passaic* case, *supra*, was again further explained and limited in *Edward Jefferson (Inc.)* v. *United States*, 18 C. C. P. A. (Customs) 322, T. D. 44583, the court pointing out that—

While, as said in the *Passaic* case, *supra*, the court "has consistently held that the mere cleansing of an article, or 'getting it by itself,' is not a manufacturing process," obviously, the holdings along that line have gone no further than to so designate those cleansing and separating steps which are taken for the purpose of putting the raw material in decent and workable condition. The doctrine may not properly be extended to cover a step which, for actual manufacturing purposes, removes an ingredient previously injected, this injection being itself for a manufacturing purpose.

Accordingly, the backwashing machines and parts thereof involved in the *Jefferson* case were held to have been correctly classified as textile machinery, even though they served "only to wash and dry wool slivers after the woolen material has been carded to sliver form."

In *United States* v. *Samuel Shapiro & Co.*, 18 C. C. P. A. (Customs) 165, T. D. 44374, machines which manufactured twines and cords were denied classification as textile machinery, because exclusively employed in the preparation of raw material which, by a further process of manufacture on different machines, was made into twines and cords.

To like effect is *United States* v. *Columbian Rope Co.*, 22 C. C. P. A. (Customs) 143, T. D. 47110. There, also, the machines were specially constructed and designed for exclusive use in preparing material to be ultimately made into cordage. Such mechanisms were held to be properly classifiable as machines not specially provided for under paragraph 372 of the act of 1922.

In *United States* v. *American Textile Engineering, Inc.*, 26 C. C. P. A. (Customs) 48, T. D. 49597, a so-called hygrolit machine was held classifiable as textile machinery. After pointing out that the machine processed textile yarns by steaming them and spraying them with a hygrolitic solution, the court said:

* * * it appears from the record in the instant case that it is necessary to subject some yarns to the hygrolitic process, or one somewhat similar, to prepare them for use in knitting or weaving textile materials. The hygrolitic process actually changes the character of the yarn; gives it elasticity; strengthens it; and lessens its tendency to kink by "setting the twist."

adding:

Surely, a machine which performs such functions and produces such results on a textile material was intended by the Congress to be included in the provision for "textile machinery" contained in paragraph 372, *supra*.

Incidentally, the court again took occasion to refer to its decision in *Passaic Worsted Co. et al.* v. *United States*, *supra*. We quote:

It may be that the language used in the *Passaic Worsted Co. et al.* case, *supra*, restated and followed in the *Jett & Co.* and *Edward Jefferson (Inc.)* cases, *supra*, is open to the interpretation placed upon it by counsel for appellee. However, as is apparent from our decision in the latter case, this court, in stating in those decisions that a textile machine was one used in the manufacture of textile materials, did not mean to be understood as holding that *only such machines as actually converted a material into a new material or article having a new name, character, or use* were intended by the Congress to be included within the statutory provisions for all other textile machinery. [Italics quoted.]

It may require more than one manufacturing process to convert a textile material into a new textile material having a new name, character, or use. Indeed, it appears from the Summary of Tariff Information, 1929, Vol. 1, pp. 823–835 (prepared by the United States Tariff Commission for the use of the Committee on Ways and Means of the House of Representatives), that many machines referred to therein as textile machinery, such as "machines for winding both raw silk and spun silk, as well as rayon, into various forms, bobbins, cops, skeins, 'beams' and there are other shapes for dyeing, or weaving in the loom," have nothing whatsoever to do with changing the character of the material on which they operate.

The case of *E. I. duPont de Nemours & Co.* v. *United States*, 27 C. C. P. A. (Customs) 146, C. A. D. 75, arose under the Tariff Act of 1930, and involved the question of the tariff status of two machines known as "Continuous Colin Presses." They were classified under paragraph 372 of said act as "textile machinery, finished or unfinished, not specially provided for," and were claimed to be properly dutiable under the same paragraph as machines not specially provided for. As pointed out in the opinion of the court—

* * * the only function performed by the machine was the reduction of the water content of the cellulose acetate from 82 or 83 per centum to 49 or 50 per centum. In other words, the machine removes about 32 per cent of water from the material, and the witness testified that in this operation there was no change in the basic substance, chemically or physically.

Further, the court held that "there is no evidence in the record overcoming the presumption that the chief use of the material was for the manufacture of rayon," and added that "the fact that a minor portion of the material upon which the machines operate is used for purposes other than textile material cannot in our opinion affect the classification of the machines here involved."

In the course of its opinion the court said:

The question of what constitutes textile machinery has been before this court in a number of cases. In the case of *Whitlock Cordage Co.* v. *United States*, 13 Ct. Cust. Appls. 656, T. D. 41490, this court held that the term "textile machinery" as used in the Tariff Act of 1922 includes machines which are used in the manufacture of textiles. This definition has been repeatedly affirmed by us.

In the case of *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. (Customs) 459, T. D. 43916, we held that machines for merely cleaning wool were not textile machines because they were not used in the manufacture of textile materials. In our opinion in that case we said:

* * *. Ever since the creation of this court it has held, consistently, that the mere cleansing of an article, or "getting it by itself," is not a manufacturing process. * * *.

It is true that this language is subject to the implication that, for an article to be a textile machine, it must perform some manufacturing process. However, such implication has been removed by us in subsequent cases.

The court then reviewed the cases in which "such implication has been removed," and proceeded to distinguish the facts in the *Passaic* case from those in the case before it. It stressed the circumstance that while the only use of the mechanism there involved was to extract water from the material, such extracting process removed water which had been previously introduced after a manufacturing process had been employed, namely, the introduction of acetic acid into cotton linters to produce cellulose acetate. The court added:

While it is true that in some of the cases decided by us a manufacturing process was involved in the use of the machines under consideration, and we have emphasized that fact, we have nowhere held that, in order to classify a machine as textile machinery, it is indispensable that the step performed by the machine must be a manufacturing process.

It is true that the first step in the manufacture of textile materials must be one which initiates such manufacture, thus distinguishing between the cases of *Passaic Worsted Co. et al.* v. *United States, supra,* and *Jett & Co.* v. *United States, supra;* but after this first step is taken and the process of the manufacture of textile material has begun, we hold that any machine chiefly employed to perform any step in such process [as well as any machine employed in said first step] is textile machinery, regardless of whether the particular step employed in a given case is in itself a manufacturing process.

In the case at bar the process of manufacturing cotton linters into a textile material had begun by the use of acetic acid, producing cellulose acetate. The step here involved of extracting water from the material was an intermediate step and was used in the manufacture of a textile material.

It follows from the foregoing that we must hold that the involved machines are textile machinery, and the judgment appealed from should be, and is, *affirmed.*

The machinery involved in *Julius Forstmann & Co.* v. *United States,* 28 C. C. P. A. (Customs) 222, C. A. D. 149, was employed to process wool cloth after it had been woven but before it was napped or dyed. It consisted of one wet decatizing machine, two double nap-raising machines, and two cloth tenterizing machines. The decatizing process sets the fibers in the cloth to make its surface smooth, and to prepare the cloth for the napping or teaseling operation. The nap-raising machines create a nap on the surface of the cloth by the action of the teasels coming into contact with the cloth. The tenterizing machines dry and remove from the cloth as it comes from the dyeing process some 85 per centum of the excess moisture contained therein. After the cloth leaves the tenterizing machine it is subjected to a number of other processes before it is finished, such as steaming, shrinking, and conditioning. Such machinery was held to be textile machinery, that provision being held to be more specific for the merchandise than the one for articles having as an essential feature an electrical element or device.

In the case of *United States* v. *Asten Hill Mfg. Co.,* 25 C. C. P. A. (Customs) 123, T. D. 49243, the court held that looms and parts thereof, especially adapted in size, shape, and structure for use in weaving heavy fabric belts made from cotton, and asbestos fiber mixed with cotton, were properly classified as textile machinery under paragraph 372, *supra.* The court quoted with approval from the *Whitlock Cordage Co.* case, *supra,* and without departing from the doctrine of that case expressed itself as follows:

\* \* \*. But surely, an article made entirely of textile threads upon a loom by the ordinary process of weaving does not lose its textile character merely because it is a finished article and not a textile material or fabric for further manufacture into such an article. \* \* \*.

Obviously, throughout the process of fabricating belts, the loom was operating upon textiles, and it was a mere incident to that process that articles (belts), rather than material (belting), were produced.

The court referred to the definitions of the word "textile" as connoting something which is or may be woven. Certainly no one would

reasonably contend that a loom, which is used in the ordinary process of weaving textile material, is not textile machinery.

The most recent decision of our appellate court on the subject of textile machinery was rendered December 8, 1943, in *Brandon Corporation* v. *United States*, 31 C. C. P. A. (Customs) 149, C. A. D. 266. There, the court took occasion to say:

At the time of entering into the trade agreement [with the United Kingdom], the negotiators thereof were, of course, aware of the fact that the term "textile machinery," as used in paragraph 372 of the Tariff Act of 1930, covered machinery used in the manufacture of textiles, such as textile fibers, filaments, yarns, and fabrics.

citing *Whitlock Cordage Co.* v. *United States*, and other decisions of that court, discussed herein.

We have reviewed somewhat at length the decisions of the appellate court upon this subject primarily to show a consistent adherence to the rule enunciated in *Whitlock Cordage Co.* v. *United States, supra*, and other cited cases. The same test of classification was applied in certain cases decided by this court, from which no appeal was taken. Conspicuous among this group was the litigation involving machines which manufactured or processed wool felt hat bodies. For instance, in *R. H. Comey Brooklyn Co.* v. *United States*, 63 Treas. Dec. 891, T. D. 46408, classification as textile machinery was denied to machines which formed or shaped felt hats or tightened or shrunk them after they had been dyed. A similar conclusion was reached concerning the hat body making machines in *American Hat Co.* v. *United States*, 67 Treas. Dec. 745, T. D. 47680, and *Ernst Neumann et al.* v. *United States*, 70 Treas. Dec. 1032, T. D. 48731.

Conversely, in *T. S. Southgate* v. *United States*, 55 Treas. Dec. 492, T. D. 43280, decided as early as March 29, 1929—a case which arose under the Tariff Act of 1922, involving the question of the tariff status of a complete dyeing plant for dyeing raw cotton—we held it to be dutiable as textile machinery. In the course of our opinion we said:

As we construe paragraph 372 and the various provisions therein for textile machines and machinery, the residuary provision for "all other textile machinery or parts thereof" is, and was evidently intended to be, exhaustive in scope and embracive of every kind and variety of textile machine not elsewhere specifically mentioned or specially provided for, the single determinative test of classification thereunder being that the machine be exclusively or chiefly employed to operate, process, manipulate, or otherwise treat textile fibers, yarns, or fabrics. It is a provision predicated solely upon the use of the machines or machinery.

Similarly, the cloth-pressing machine involved in *Alfred Suter* v. *United States*, 65 Treas. Dec. 1408, Abstract 27551, was held classifiable as textile machinery, since it functioned to impart a sheen or finish to cloth which advanced its condition as a textile material.

Fairly summarized, the judicial authorities would seem to include within the term textile machinery (1) mechanisms which produce textile fibers, yarns, materials, or articles; (2) devices which improve such fibers, yarns, or materials *per se*; and (3) machines which perform any step in the process of producing a textile material or textile article, whether or not the step itself is a manufacturing operation. Conversely, the term would not include machines the sole function of which is to make rope or other non-textile articles from textile materials. Neither would it include devices employed to process articles made from textile materials, or which perform some operation on a finished textile material.

In the present case, when handkerchiefs with scalloped edges were embroidered on the cotton cloth, that which was formerly textile material ceased to exist as such and became handkerchiefs in the piece. In other words, cloth which had been completely finished as textile material and was available for a variety of uses, was, by further manufacturing processes, dedicated to a single use—as handkerchiefs.

It is well-settled law that articles in the piece, upon which nothing remains to be done except to cut them apart, must be treated for tariff purposes as if already cut apart, and classified according to their individual character or identity. *United States* v. *Buss & Co.*, 5 Ct. Cust. Appls. 110, T. D. 34138, and cases cited therein; *United States* v. *M. H. Rogers, Inc.*, 18 C. C. P. A. (Customs) 271, T. D. 44448.

Inasmuch as we are satisfied that handkerchiefs in the piece are not textile material, it logically follows that the imported machine which merely cuts two sides of the handkerchiefs in separating them from the piece, is not textile machinery, as contemplated by said paragraph 372. Apparently some precision is required in cutting along the scalloped edges, but, as disclosed by the evidence, it is an operation which could be performed equally as well by hand shears or scissors, except for the length of time required and expense involved.

It is clear that the machine in controversy, which merely performs a cutting operation, is far removed from the character of machines which have been held by the courts to be properly classifiable for tariff purposes as textile machinery, all of which were machines that were utilized in the treatment, processing, or manipulation of textile materials.

We accordingly find and hold that the imported scallop-cutting mechanism is not textile machinery in the tariff sense.

Although not relied upon in plaintiff's brief, we shall next consider the claim invoked by the protest alleging that the imported article is dutiable at the rate of 35 per centum ad valorem under the third subdivision of paragraph 353 of the Tariff Act of 1930 as an article "hav-

ing as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; * * *"

It appears from the testimonial record that the machine as imported had bolted thereon an electric motor which furnishes the operating power, and there is no competent proof before us to establish that the the machine could be operated by any power other than electricity. The testimony directed to this point is wholly insufficient. We quote therefrom as follows:

Q. * * *. Basing your answer upon your experience, *is it possible* to operate that machine by any other source of power?—A. Yes, you could connect it with a power table.

Q. What has to be done to connect it to another source of power?—A. Well, *I suppose* you have to connect it with a power by gear or whatever is done; *I am not familiar with that.*

Q. Well, assuming that an overhead line shaft——A. It wouldn't be feasible, not according to my idea.

Q. Is there anything about the operation of the machine which requires an electric motor to operate it?—A. Well, it requires power.

Q. It requires power. Now, what source of power is or can be used?—A. It can either be used with a motor, an individual motor, or it can be used from a power table whereby some connection from the power table the machine is driven.

Q. Could the pulley on the machine be connected directly to the power table?—A. *I suppose so. I am not familiar with that.* [Italics supplied.]

The above is all of the testimony apparently designed to establish the possibility of interchangeable use of a power other than electricity in operating the machine in controversy. We deem such testimony lacking in probative value sufficient to establish that objective. The witness intimated that the machine could be operated by energy supplied from a "power table." However, the record is silent as to what a power table is, or whether it transmits electrical or other power.

In *Ralph C. Coxhead Corp.* v. *United States,* 22 C. C. P. A. (Customs) 96, T. D. 47080, wherein the question of interchangeability of motive power was being considered, the court, in commenting upon testimony which was excluded by the trial court, remarked:

We think the importer had the right to prove whether or not the machine involved was designed and constructed to be used interchangeably by both hand power and electrical power in the sense that is indicated in our views hereinbefore expressed. * * *.

In the case before us every opportunity was afforded the plaintiff to prove by competent evidence, if such could be adduced, whether or not the machine was designed and constructed to be operated interchangeably by electrical or other power. However, that opportunity was not availed of either at the original trial or at the rehearing. It is clear, however, that in its imported condition the machine had an electric motor bolted to it, and to all intents and purposes it was a machine having as an essential feature an electrical element or

device within the meaning of paragraph 353, as interpreted in *United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050. There, the merchandise consisted of a rubber-cutting device. As imported it was in a knocked-down condition. It appears from the opinion of the court that two electric motors accompanied the machine, and that bolt holes in the proper place in the machine were provided for the attachment of the motors. There was testimony before the court "that hand power could be applied by removing the motor and installing a pulley with a handle," and that "if it were desired to operate the machine by direct drive" it would be necessary to "put a jack shaft on the floor, remove the motor, and run it by the main line of the shaft." However, it was the opinion of the court that—

\* \* \*. The motor is of the proper size to drive the machine, and no other method of applying power is provided or arranged for. No other power can be applied without a reconstruction of the machine, in part. \* \* \*. In other words, as imported, the machine is an electrical machine.

Obviously, the machine in controversy required motive power to operate it. As imported, it was equipped with an electric motor bolted to it and definitely designed to supply its motivating power. So far as we are informed, "no other method of applying power is provided or arranged for." *United States* v. *Dryden Rubber Co., supra.*

Accordingly we find and hold that the imported machine is an article having as an essential feature an electrical element or device within the meaning of the third subdivision of paragraph 353, *supra.* It becomes unnecessary, therefore, to consider the further claims of plaintiff that the importation is dutiable under the provision for all other machines in paragraph 372, *supra*, or under either of the provisions in said paragraph 353 as modified by the trade agreement with the United Kingdom, *supra.*

The provision in the third subdivision of paragraph 353 of the Tariff Act of 1930 is clearly more specific than the general provision for machines not specially provided for in paragraph 372, *supra*, relied upon by plaintiff. *United States* v. *Dryden Rubber Co., supra.*

The two provisions in paragraph 353, as modified by the trade agreement, *supra*, so far as here pertinent, read:

(1) \* \* \* and articles having as an essential feature an electrical element or device, such as electric motors, locomotives, portable tools, furnaces, heaters, ovens, refrigerators, and signs (except \* \* \* machines not herein provided for by name which would be dutiable under paragraph 372, Tariff Act of 1930, if of a kind which could be designed to operate without such electrical element or device \* \* \*) \_ \_ \_ \_ \_ \_ 25% ad val.
(2) Machines having as an essential feature an electrical element or device and which would be dutiable under paragraph 372, Tariff Act of 1930, if of a kind which could be designed to operate without such electrical element or device \* \* \*. \_ \_ \_ \_ \_ \_ 27½% ad val.

In the absence of proof that the imported machine is "of a kind which could be designed to operate without such electrical element or device," namely, the electric motor, we find upon the record that the importation is not within the terms of either of the modifying provisions of said paragraph 353.

In view of our finding and holding that the imported machine is not textile machinery within the meaning of paragraph 372, *supra*, but is in fact an article having as an essential feature an electrical element or device within the meaning of paragraph 353 of the Tariff Act of 1930, and as such dutiable thereunder at the rate of 35 per centum ad valorem, we sustain that claim in the protest and reverse the decision of the collector. All other claims are overruled. Judgment will be entered accordingly.