(R.D. 11292)

J. L. WOOD v. UNITED STATES

Entry No. 2817, etc.

(Decided April 26, 1967)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.

*Barefoot Sanders*, Assistant Attorney General (*James S. O'Kelly* and *Morris Braverman*, trial attorneys), for the defendant.

FORD, Judge: Plaintiff by this action seeks a reappraisement as to the proper value for duty purposes of certain bus shells imported

from Canada and entered at the port of Pembina, N. Dak. The involved merchandise does not appear on the final list promulgated by the Secretary of the Treasury, 93 Treas. Dec. 14, T.D. 54521, and is, accordingly, subject to appraisement under the provisions of section 402, Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T D. 54165.

The merchandise was appraised on the basis of constructed value as provided for in section 402(d), Tariff Act of 1930, as amended, *supra.* Plaintiff claims the merchandise to be properly subject to appraisement under the provisions for export value as contained in section 402(b), Tariff Act of 1930, as amended, *supra,* or, alternatively, on the basis of constructed value. The dutiable value, in either event, is contended to be $18,188.02 (Canadian currency) per shell, less the cost of United States components.

The pertinent portions of the statute involved read as follows:

Section 402, Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \* \*

(d) CONSTRUCTED VALUE.—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise

undergoing appraisement in condition, packed ready for shipment to the United States.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(f) Definitions.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

    (A)　to all purchasers at wholesale, or

    (B)　in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

(3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, than all other purchasers who buy in the usual wholesale quantities.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(g) Transactions Between Related Persons.—

(1) For the purposes of subsection (c) (1) or (d), as the case may be, a transaction directly or indirectly between persons specified in any one of the subdivisions in paragraph (2) of this subsection may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise of the same general class or kind as the merchandise undergoing appraisement. If a transaction is disregarded under the preceding sentence and there are no other transactions available for consideration, then, for the purposes of subsection (d), the determination of the amount required to be considered shall be based on the best evidence available as to what the amount would have been if the transaction had occurred between persons not specified in any one of the subdivisions in paragraph (2).

(2) The persons referred to in paragraph (1) are:

    (A)　Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants;

(B) Any officer or director of an organization and such organization;

(C) Partners;

(D) Employer and employee;

·(E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting stock or shares of any organization and such organization; and

(F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

At the outset of the trial, counsel for the respective parties stipulated the following facts:

| | | | |
|---|---|---|---|
| 1. | Cost of materials | $7, 808. 89 | (Canadian currency) |
| 2. | Cost of labor | 4, 069. 83 | " " |
| 3. | Appraiser added for general expenses. | 4, 622. 01 | " " |
| 4. | Appraiser added for profit. | 1, 770. 53 | " " |

$18, 271. 26 (Per bus shell—Canadian Currency)

It was further stipulated that the addition by the appraiser for general expenses and profit was based upon the sale of completed buses in Canada.

The record herein consists of the testimony of four witnesses called on behalf of plaintiff and two exhibits received in evidence as plaintiff's exhibits 1 and 2 as well as the official papers which were received in evidence without being marked. A letter from the exporter was received in evidence as defendant's exhibit A.

The first witness called on behalf of plaintiff was Mr. Harry Soltok who testified that he was both president of Motor Coach Industries, Ltd., of Winnipeg, the exporter, and Motor Coach Industries, Inc., of Pembina, the importer; that in his dual capacity in both companies, he was also general manager and administrator of each; that the business of Motor Coach Industries, Ltd., was the manufacture of buses and bus shells; that completed buses were sold in Canada and only bus shells were sold to the sole importer, Motor Coach Industries, Inc.

The witness explained the relationship of the two companies as follows:

1. Greyhound Corp. of Chicago owns 100 percent of the stock of Motor Coach Industries, Inc., of Pembina.

2. Greyhound Lines of Canada owns 100 percent of the stock of Motor Coach Industries, Ltd., of Winnipeg.

3. Greyhound Corp. of Chicago owns 62 percent of the stock of Greyhound Lines of Canada. (It also appears that Mr. Soltok was vice

president of Greyhound Lines of Canada, Ltd., in charge of manufacturing.)

Mr. Soltok then testified that the invoice price of $18,514, Canadian funds, per bus shell, was arrived at on the basis of an estimated price; that all the costs, material, labor, and overhead were estimated and a 10 percent profit was added; that, after the first run of 100 units, they were able to establish the actual costs, and credit notes were passed afterwards to come to the true cost price, plus 10 percent agreed upon; that negotiations as to the 10 percent profit finally agreed upon were initiated by him; at the negotiations he was present and represented Motor Coach Industries, Inc., and Ltd., as their president, and Mr. Fraily, President of Greyhound Corp. of Chicago, represented that corporation while Mr. Borden, the then president of Greyhound Lines of Canada, represented his corporation. Both Mr. Fraily and Mr. Borden sought the best possible financial arrangement for their respective corporations in order to protect their stockholders. After considerable negotiations, the 10 percent figure was agreed upon. While Motor Coach Industries, Ltd., had previously tried to realize a profit of 12.02 percent, after negotiations they accepted the 10 percent figure which was to be based upon an audit of the books of Motor Coach Industries, Ltd., by Greyhound Corp. of Chicago.

The next witness called on behalf of plaintiff was Mr. Frank Dill, a chartered accountant, who is comptroller of both Motor Coach Industries, Ltd., and Motor Coach Industries, Inc. He testified that his position was to keep the financial records of both companies including cost records and assets. He was also familiar with the sales and selling policies of the companies. Mr. Dill produced two documents which were received in evidence as plaintiff's exhibit 1 which set forth the manufacturing overhead of general expenses in relation to the run of 100 bus shells. Based upon plaintiff's exhibit 1, it appears that the manufacturing overhead is $3,352.25, Canadian funds, per shell, and general expenses are $1,303.59, Canadian funds, per shell, which total amount is $4,655.84, Canadian funds, per shell. This sum includes all overhead and fixed expenses and costs, and all variable costs incurred in producing the involved bus shells. When the above figure is added to the stipulated cost of materials, $11,878.72, Canadian funds, a total cost figure of $16,534.56, Canadian funds, is obtained. Profit of 10 percent of this figure ($1,653.46, Canadian funds) was then added, and the total cost per shell was $18,188.02, Canadian funds. The difference between the figure of $18,514, Canadian funds, per shell, as invoiced, was established to be merely an estimate, and said funds were paid on a weekly basis. However, Motor Coach Industries, Inc., in due course, received a credit bill from Motor Coach Industries, Ltd., to cover this difference.

The witness identified a list of sales of bus shells, which was received in evidence as plaintiff's exhibit 2. The price of the bus shells did not depend upon the quantity sold and no packaging charges were involved. The figures testified to by this witness included all expenses incident to placing the bus shells in condition, ready for shipment to the United States. All prices were f.o.b. Winnipeg. Mr. Dill was of the opinion that the final selling price fairly reflected the market value since it was the best price that could be negotiated under the circumstances.

John W. Beech, a chartered accountant, whose firm audits the books of Motor Coach Industries, Ltd., testified that, based upon his examination of the books and records of said corporation, the cost records were true and correct. The witness was of the opinion that the 10 percent profit was a fair one since it gave the manufacturer an opportunity to expand its business and facilities in Canada to its stockholders' enjoyment.

The final witness called on behalf of plaintiff, a certified public accountant, testified that 10 percent profit, in his opinion, was fair since many manufacturing companies make profits in this range and many do not. The balance of his testimony related to the impropriety of adding to the cost of the bus shells, exported to the United States, the general expenses incurred in producing finished buses for sale in Canada since they are different products. The other witnesses were also of this opinion.

Based upon the record as made herein, it is the position of plaintiff that export value, under the amended statutory provision for said basis, has been established notwithstanding the relationship between the exporter and importer. The record is abundantly clear that such a relationship exists and that the importer falls within the purview of a person who purchases "for industrial use" as defined in section 402 (f) (3) and, as such, was a purchaser in the ordinary course of trade. The record also establishes that the questions of usual wholesale quantity or principal markets were not involved nor was the question of packing. There were no restrictions imposed by the exporter as to the disposition or use of the involved merchandise.

The statutory provisions, section 402 (f) and section 402 (g), *supra*, expressly authorize sales to a select purchaser whether or not they are related persons. Accordingly, export value as provided for in section 402 (b), *supra*, may exist provided said value "fairly reflects the market value." In resolving this question, it is proper to take into consideration all sales including those made in the home market and also to consider the production costs, general expenses, and profits involved in the export transaction. *United States* v. *Acme Steel Company*, 51 CCPA 81, C.A.D. 841.

The record herein establishes that there are no other manufacturers of bus shells in Canada and that the exporter does not sell bus shells

in Canada but only the completed buses. Accordingly, the question of sales by the exporter in the foreign market is moot. The record does establish, however, production costs, general expenses, and profits. While the plaintiff contends that both general expenses and profits are in issue, it appears to me that only the question of profit is really involved. The parties have stipulated the labor and material costs to be $11,878.72, Canadian funds. They have also agreed that the appraiser added $4,622.01, Canadian funds, for general expenses. The record, however, establishes the actual general expenses to be $4,655.84, Canadian funds. To the actual figures, the exporter added 10 percent profit while the appraiser added 10.7 percent for profit. By virtue of the manner of the negotiations regarding profit between the parent corporations of the importer and exporter, defendant contends such negotiations are not at arm's length. It is a matter of common knowledge of which the court may take judicial notice that both Greyhound Corp. of Chicago and Greyhound Lines of Canada are public corporations listed on a leading stock exchange of their respective countries and, since each was negotiating for the best possible situation in order to benefit their respective stockholders, such negotiations can, under the circumstances, be considered at arm's length.

Having before us the actual production costs, general expenses, and profits and it having been established that there are no other manufacturers in the country of exportation, we may accept the actual figures as we have done under the predecessor statute. *United States* v. *Henry Maier*, 21 CCPA 41, T.D. 46378; *United States* v. *Jovita Perez*, 36 CCPA 114, C.A.D. 407; *English Electric Export & Trading Co., Inc., et al.* v. *United States*, 53 CCPA 84, C.A.D. 881.

Accordingly, we are of the opinion that the price involved herein, which embraces all of the elements entering into production costs, fairly reflects the market value of the imported bus shells.

On the record herein, I find the following facts:

1. The merchandise covered by this appeal for a reappraisement consists of bus shells imported from Canada.

2. That such merchandise is not specified on the final list promulgated by the Secretary of the Treasury, 93 Treas. Dec. 14, T.D. 54521.

3. That the merchandise was appraised on the basis of constructed value as defined in section 402(d) of said act, as amended, *supra*.

4. That, at the time of exportation, the exporter was the sole manufacturer of such merchandise.

5. That the exporter and importer are related persons within the definitions set forth in section 402(g).

6. That, during the period in question, such merchandise was sold by the importer involved herein without any restriction as to the disposition or use of said merchandise.

7. That the questions of usual wholesale quantity, principal markets, and packing were not involved.

8. That, during the period in question, the actual production costs and purchase price was $18,188.02, Canadian currency, per shell.

I, therefore, conclude as matters of law:

1. That export value as defined in section 402(b) of said act, as amended, *supra*, is the proper basis for the determination of value of the merchandise covered by the instant appeal for a reappraisement.

2. That said value is $18,188.02, Canadian currency, per shell, less the cost of United States components as invoiced.

Judgment will be entered accordingly.