(R.D. 11665)

PARAMOUNT TEXTILE MACHINERY CO. ET AL. v. UNITED STATES

Entry No. 3096, etc.

(Decided May 1, 1969)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Rufus Jarman* of counsel) for the plaintiffs.

*William D. Ruckelshaus*, Assistant Attorney General (*Harold L. Grossman*, trial attorney), for the defendant.

Ford, Judge: These consolidated appeals for reappraisement cover certain preboarding machines exported from England between December 5, 1960 and January 27, 1965 by Samuel Pegg & Son, Ltd., of Leicester, England (hereinafter referred to as Pegg) to Paramount Textile Machinery Co. of Chicago, the actual importer herein. These machines, whose nature and function will be detailed in due course, were considered by the appraiser to be listed on the Final List of the Secretary of the Treasury, 93 Treas. Dec. 14, T.D. 54521, and hence subject to appraisal in accordance with the "old" valuation provisions of section 402a of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165. Accordingly, the merchandise was appraised on the basis of foreign value as defined in section 402a(c) of said act, as amended.

Plaintiffs claim that the instant machines are not on the Final List, *supra*, and hence should be appraised on the basis of the "new" law; more specifically, under export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165. In the alternative, plaintiffs claim that cost of production as defined in section 402a(f) of the Tariff Act of 1930, as amended, is the proper basis for valuation, if the importation is indeed on the Final List.

The relevant statutory and nonstatutory material read as follows:

Section 402a(c) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, *supra.*

> (c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402a(f) of the Tariff Act of 1930, as amended:

> (f) COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—
>
> > (1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the

date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

Final List of the Secretary of the Treasury, 93 Treas. Dec. 14, T.D. 54521, at page 34:

Machinery, for bleaching, printing, dyeing or finishing textiles, and parts thereof

Section 402(b) of the Tariff Act of 1930, as amended:

(b) Export Value.—For the purpose of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402(f)(1)(B) of the Tariff Act of 1930, as amended:

(f) Definitions.—For the purposes of this section—
(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

\* \* \* \* \* \* \*

(B) in the ordinary course of trade to one or more selected purchasers at a price which fairly reflects the market value of the merchandise.

\* \* \* \* \* \* \*

Plaintiffs made a claim for cost of production as the basis of appraisement in previous litigation involving preboarding machines.

*Paramount Textile Machinery Co.* v. *United States*, 52 Cust. Ct. 392, Reap. Dec. 10654, affirmed in *Paramount Textile Machinery Co.* v. *United States*, 56 Cust. Ct. 761, A.R.D. 202. In that case plaintiff endeavored to show as a prelude to its claim under cost of production, that the use of foreign value as a basis for reappraisement was inappropriate due to the fact that the instant machines were not freely offered for home consumption as required by the statute. Plaintiff attempted to prove, by the affidavit of Guy S. Helliwell, then managing director of Pegg, that it restricted sales of preboarding machines to manufacturers of hosiery and refused to sell to machine dealers and distributors. This court held that plaintiff had failed to show that its "restrictions" consisted of anything more than an emphasis on sales to manufacturers and had failed to prove any concrete restrictions or exclusions of any class of purchasers. The record in that case has been incorporated herein.

In this case plaintiff's have attempted to supply the deficiencies of proof with regard to the restrictiveness of their sales policy by offering in evidence, as plaintiffs' exhibits 5 and 6, the affidavits of two English machine dealers attesting to the fact that they did not deal with Pegg due to its continuing policy, known to the trade, of only selling to users. In addition, as noted previously, plaintiffs now make an entirely new claim which places in issue the propriety of appraising these importations under the "old" law. It is this new claim which must be examined first since it is the most basic and preliminary argument advanced by plaintiffs and its resolution will determine the fundamental choice of law which will govern the case.

Plaintiffs claim that the designation "Machinery, for * * * finishing textiles" found in the Final List does not describe the instant importations. It appears from the record in the incorporated case and herein, consisting principally of the testimony of William P. Pope, president of Paramount, that the preboarding machines are used in the course of hosiery manufacture. Nylon "hosiery blanks" or "tubes" are placed on leg shaped forms and subjected to steam pressure inside the dome of the preboarding machine. This process gives a permanent set to the thermoplastic yarn of which the hosiery blank is composed, thus causing it to retain the shape it is given. A sample of the nylon hosiery blank in its state immediately before it is put in the preboarding machine was placed in evidence as plaintiffs' illustrative exhibit 9. A sample of the stocking which emerges from the preboarding machine was placed in evidence as plaintiffs' illustrative exhibit 10. The relationship between these two articles can best be expressed as somewhat analogous to that between an unpressed and a pressed shirt. The nylon hosiery blank possesses the basic characteristics of a woman's stock-

ing; it is closed at one end; the heel and toe position are reinforced as is the portion at the open end.

Keeping in mind the working of the preboarding machine and the article upon which it performs its work we can turn to a close consideration of relevant judicial decisions. Although for our purposes the Final List mentions only the narrow category of textile *finishing* machines, I find the case law dealing with the broader statutory provision for textile machinery extremely useful in yielding principles which are decisive of the issue in this case.

The tariff provision for textile machinery has been the subject of litigation ever since its appearance in the Tariff Act of 1922, ranging from the preparation and production of yarn, *Whitlock Cordage Co.* v. *United States*, 13 Ct. Cust. Appls. 656, T.D. 41490; *Passaic Worsted Co. et al.* v. *United States*, 17 CCPA 459, T.D. 43916, through the actual manufacture of the textiles, *E. I. du Pont de Nemours & Co.* v. *United States*, 27 CCPA 146, C.A.D. 75, and the production of finished articles, *United States* v. *Asten Hill Mfg. Co.*, 25 CCPA 123, T.D. 49243. See also *Border Brokerage Co.* v. *United States*, 51 Cust. Ct. 259, Abstract 68122.

The above cases set forth the limits of the provision for textile machinery. No precedent exists for the inclusion as textile machinery of a machine which first starts its work on an article which is no longer a textile. In an analagous situation machines which pressed and shaped hat bodies were found not to be textile machines. *R. H. Comey Brooklyn Co.* v. *United States*, 63 Treas. Dec. 891, T.D. 46408; *Wm. J. Jones & Co.* v. *United States*, 64 Treas. Dec. 1067, Abstract 25944. In the latter decision the court stated:

> On the established facts we regard our decision in *R. H. Comey Brooklyn Co.* v. *United States* (T.D. 46408) on hat presses or hat-pressing machines, as here controlling. There, the machines were used to rough-form, shape, tighten, or shrink felt hats. They were held not to be textile machinery as that term was judicially defined in *Whitlock Cordage Co.* v. *United States* (13 Ct. Cust. Appls. 656, T.D. 41490), in that they were not "machines which are used in the manufacture of textile materials." *A hat body is something more than mere material; it may be made from textile material, but it is an article with a distinctive name and use, which precludes it from being longer considered as simply material.* The prevailing decisions on the subject have not extended the scope and meaning of the term "textile machinery" to include machines which convert textile materials into completed articles which are not in themselves textiles. * * * *It may be true that the hat bodies which are processed by the machines at bar are made of textile material, but it does not necessarily follow that the hat bodies themselves are textiles.* [Emphasis supplied.]

In *Graemiger Bros., Inc.* v. *United States*, 12 Cust. Ct. 48, C.D. 829, this court held that a scallop cutting machine used to cut two sides of handkerchiefs in the piece was not within the purview of the provision for textile machinery. The court summarized the law and concluded as follows:

> Fairly summarized, the judicial authorities would seem to include within the term textile machinery (1) mechanisms which produce textile fibers, yarns, materials, or articles; (2) devices which improve such fibers, yarns, or materials *per se;* and (3) machines which perform any step in the process of producing a textile material or textile article, whether or not the step itself is a manufacturing operation. Conversely, the term would not include machines the sole function of which is to make rope or other non-textile articles from textile materials. *Neither would it include devices employed to process articles made from textile materials*, or which perform some operation on a finished textile material.
>
> In the present case, when handkerchiefs with scalloped edges were embroidered on the cotton cloth, that which was formerly textile material ceased to exist as such and became handkerchiefs in the piece. In other words, cloth which had been completely finished as textile material and was available for a variety of uses, was, by further manufacturing processes, dedicated to a single use—as handkerchiefs. [Emphasis supplied.]

It is unnecssary for me to elaborate on the relevance of the above to the present situation or to decide at what point in time the hosiery blanks ceased to be mere textile material or textiles. It suffices to say that the record herein, together with a close scrutiny of plaintiffs' exhibits 9 and 10, supports the conclusion that the hosiery blanks which enter the preboarding machines are in a state of development analagous to that of the hat bodies and handkerchiefs discussed above. They have shed their original character as textiles and have become articles of manufacture in their own right. Although they are unfinished and unsalable in the unshaped form they are definitely more than simple textiles and the machine which processes them is not a textile machine. It follows therefore, *a fortiori* that the importations are not textile finishing machines as listed on the Final List.

For the above reasons I conclude that the instant importations do not appear on the Final List and hence are subject to appraisement under the "new" law, namely, section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, *supra.*

Although it has successfully proved the action of the appraiser erroneous the burden remains on the plaintiffs to prove the value they claim. *I. Arditi* v. *United States*, 50 CCPA 49, C.A.D. 818; *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593. As noted previ-

ously one of plaintiffs' claims is for appraisement on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended, *supra*, and it is to the evidence bearing on this question that I now turn. It appears from the record herein, most notably the affidavit of John Horn Simpson, managing director of Pegg, which was placed in evidence as plaintiffs' exhibit 4, that during the period in question Pegg offered preboarding machines for sale in the United States only to Paramount and that the latter is the United States distributor for said machines. As such it is clear that Paramount is a selected purchaser within the meaning of section 402(f)(1)(B) and it is therefore incumbent upon plaintiff to show that the price to Paramount fairly reflected the market value of the merchandise. *United States* v. *Acme Steel Company*, 51 CCPA 81, C.A.D. 841; *The American Greiner Electronic, Inc.* v. *United States*, 62 Cust. Ct. 905, R.D. 11658. To this end plaintiff introduced in evidence, as plaintiffs' exhibit 4, the affidavit of John Horn Simpson, managing director of Pegg since 1965 and associated with the firm since 1949. The portion of the affidavit relevant to the claim under export value is as follows:

> I further declare that the selling price of complete Preboarding Machines from the company to Paramount during the years 1960, 1961 and 1962 was approximately 15% lower than the company's selling price direct to factories in Great Britain. The reason is that the company ordinarily appoints selling agents in overseas countries and pays them a commission of 10 per cent. Paramount, however, does not act as selling agent but as Principal.

> Furthermore in the case of sales to Paramount the company does not incur certain expenses which we incur when we sell direct to factories in Great Britain, as set forth in the attached schedule B. These expenses for the three years 1960, 1961 and 1962 averaged 4.88 per cent which when added to the 10 per cent selling commission ordinarily paid to our overseas agents, accounts for the approximate difference of 15 per cent previously referred to.

> The machines which were the subject of court cases R. 63/1679, R. 65/16711, R. 63/1680, R. 65/18646 and R. 66/12889 were ordered by Paramount to be made without domes, and were exported to Paramount without domes. These were "special order" machines, and we do not have a market for domeless machines anywhere else in the world except those domeless machines which we sell to Paramount.

SCHEDULE B.

|  | 1960 | 1961 | 1962 |
| --- | --- | --- | --- |
|  | £ | £ | £ |
| Total sales: | 811041 | 953584 | 941330 |
| Less Paramount: | 99428 | 100308 | 79146 |

| | | | |
|---|---|---|---|
| Sales against which the following expenses have accrued: | £711613 | £853276 | £862184 |
| Discount allowed: | 664 | 132 | 329 |
| Sales Department Salaries: | 10115 | 13645 | 14774 |
| Travelling and Sales Expenses: | 4750 | 5550 | 6229 |
| Demonstration and service expenses: | 160 | 40 | 203 |
| Advertising: | 8014 | 9751 | 7894 |
| Motor Vehicles:   Maintenance: | 1585 | 1454 | 1679 |
|    Depreciation: | 1906 | 1886 | 1056 |
| Credit Insurance: | 1033 | 1727 | 1608 |
| Subscriptions and donations: | 431 | 393 | 482 |
| 50% Directors' Emoluments: | 6046 | 6575 | 5787 |
| Bad Debts Provision: | *182 | 1977 | 722 |
| | £34522 | £43130 | £40763 |
| Percentage of Sales Expenses to Net Sales as above | 4.85% | 5.05% | 4.73% |
| Aggregate percentage for the three years 1960, 1961 and 1962 | | 4.88% | |

[*Typed in red.]

Mr. Pope, in his testimony at the hearing, confirmed that five of the invoices herein covered domeless machines. Photographs of an assembled domeless preboarding machine and an assembled preboarding machine with a dome were introduced in evidence as plaintiffs' illustrative exhibits 7 and 8, respectively.

The final aspect of plaintiffs' proof, set forth above, falls short of what is required due to its indefinite and incomplete nature. As seen, the price to factories in Great Britain is represented to be 15 percent above the price to Paramount. It is plaintiffs' burden to account for this difference so as to show that the lower price to Paramount fairly reflects the market value represented by the price to English factories. 4.88 percent of this difference is accounted for by a specific listing of expenses not incurred in sales to the United States. The remaining portion of approximately 10 percent is explained as the cost of commissions and "overseas" selling agents. Yet the word "overseas" as used in an affidavit made in Great Britain must refer to agents for sales outside Britain. Accordingly, the expense of commission for those overseas sales cannot apply to sales to domestic British factories. Thus, the affidavit leaves out the explanation and justification for the major portion of the 15 percent differential between the price to Paramount and the price to British factories. The expense of selling commissions for sales outside Britain would not ordinarily apply to

sales in Britain and the affidavit gives no reason why they should. Hence, I find that the price to Paramount does not fairly reflect the price which plaintiffs offer as the market value due to the fact that only one third of the differential has been adequately explained.

I draw no distinction at this point between the effect of this failure of proof on the cases involving preboarding machines with domes and the cases involving those without domes. It would appear that plaintiffs urge a less rigorous standard of proof of export value for the former on the ground that they were "special order" machines sold only to the plaintiff. In such a situation, plaintiffs, citing *J. L. Wood* v. *United States*, 58 Cust. Ct. 682, R.D. 11292, suggest that the showing (made to support plaintiffs' alternate claim under cost of production) that these machines were sold at their full cost of production plus a substantial profit will suffice to prove that their price fairly reflects market value. I consider the situation herein to be clearly distinguishable from that in *J. L. Wood*, *supra*, inasmuch as all the importations herein, whatever their state of completeness, are still preboarding machines. In *J. L. Wood* the bus shells in issue were quite remote and different from the complete buses usually sold by the exporter. In addition the record there established that there was no other manufacturer of bus shells in the country of exportation. Here the absence of a dome does not clearly make those machines separate and identifiably different articles of commerce. Simply stated, they are still preboarding machines. Moreover, in this case there is no proof that the other British manufacturer of preboarding machines, Andrew Engineering and Development Company, Ltd. (the affidavit of whose chairman was introduced in evidence in the incorporated case in an attempt to disprove foreign value and prove cost of production), does not also sell domeless preboarding machines in the British market.

By reason of the above detailed deficiencies in plaintiffs' proof of export value, I am constrained to uphold the value found by the appraiser.

In light of the foregoing, I find the following facts:

1. The merchandise covered by these consolidated appeals for reappraisement consists of preboarding machines exported from Great Britain between December 5, 1960 and January 27, 1965.

2. The machines in question were appraised on the basis of foreign value as defined in section 402a(c) of the Tariff Act of 1930, as amended.

3. The machines in question do not appear on the Final List of the Secretary of the Treasury, 93 Treas. Dec. 14, T.D. 54521.

4. During the period in question these machines were sold for exportation to the United States only to Paramount Textile Machinery Co. of Chicago.

5. The difference between the market price in Great Britain and the price to Paramount was not adequately explained or accounted for by plaintiffs.

I, therefore, conclude as matters of law:

1. Plaintiffs have failed to show that the price to the United States importer fairly reflected the market value of the merchandise in question.

2. The values returned by the appraiser are presumptively correct and remain in full force and effect.

Judgment will be entered accordingly.